(104 So. 264)

## WARREN v. ALABAMA FARM BUREAU COTTON ASS'N.    (2 Div. 860.)

(Supreme Court of Alabama.    April 23, 1925.)

**1. Agriculture ⬦6—Complaint held to show co-operative marketing contract.**

Complaint by co-operative marketing association, alleging that defendant entered into contract with it in the form in general use by it, *held* to sufficiently show completed contract between parties.

**2. Pleading ⬦312—Allegations of marketing agreement not contradicted by form of agreement attached to bill.**

In suit to enforce co-operative marketing. agreement, allegation that contract was made *held* not contradicted by exhibit attached to bill, which was referred to merely as substantial copy of form of contract used in present instance and in general.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**3. Contracts ⬧10(1)—Co-operative market-ing agreement held mutual contract.**

A co-operative marketing association agreement *held* mutual in operation and benefits, as promise of one party is sufficient consideration for promise of the other.

**4. Agriculture ⬧6—Marketing association agreement not unjust.**

Co-operative marketing association's agreement with member, under Sp. Acts 1921, p. 38, *held* not unjust and unreasonable, but to provide for equal treatment of all members, and to give no arbitrary power of apportioning funds borrowed on cotton unequally.

**5. Injunction ⬧61(1)—Breach of co-opera-tive marketing association agreement may be enjoined.**

Co-operative marketing association agreement, authorized under Sp. Acts 1921, p. 38, could be enforced by enjoining member from improper disposition of crop for single season, especially where statute provides for injunction to prevent such threatened breaches.

**6. Agriculture ⬧6—Agreement with co-operative marketing association not contrary to public policy.**

Agreement between member and co-operative marketing association, established under Sp. Acts 1921, p. 38, *held* not contrary to public policy, which is primarily determined by acts of Legislature, in absence of constitutional prohibition.

**7. Monopolies ⬧9—Legislature may not authorize associations to cause scarcity of necessaries or unreasonably increase their cost.**

Under Const. 1901, § 103, Legislature may not enact laws authorizing associations or combinations to cause artificial scarcity of necessaries, or commodities of trade, or unreasonably increase their cost to consumer.

**8. Monopolies ⬧17(2)—Co-operative marketing agreement held not to create scarcity of cotton.**

Co-operative marketing association, established under Sp. Acts 1921, p. 38, requiring members to sell cotton through association, *held* not to tend to create scarcity of cotton either by discouraging production or unreasonably withholding it from market, so as to render act violative of Constitution, § 103.

**9. Monopolies ⬧10—Co-operative marketing act held not to unreasonably increase cost of cotton to consumer so as to be unconstitutional.**

Acts 1921, p. 38, authorizing co-operative marketing associations, *held* not to violate Const. 1901, § 103, by unreasonably increasing cost of cotton to consumer; such associations merely protecting producer against oppression, and being a reasonable restraint, not injurious to public interests.

**10. Monopolies ⬧24(1)—If marketing association, used to injure public interests, equity may grant relief.**

If co-operative marketing association is being used for unlawful purpose to injure public interests by creating scarcity of commodities, or unreasonably enhancing market price, court of equity may grant relief.

Appeal from Circuit Court, Perry County; S. F. Hobbs, Judge.

Bill for specific performance of a contract by the Alabama Farm Bureau Cotton Association against E. S. Warren. From a decree on demurrer respondent appeals. Affirmed.

The bill is filed by the Alabama Farm Bureau Cotton Association, a nonprofit sharing association organized and incorporated under the act of the Legislature approved October 29, 1921 (Special Session Acts 1921, p. 38). The respondent is a member of the association, and the purpose of the bill is to specifically enforce the contract exhibited between complainant and respondent.

The title of the act referred to is:

"An act to provide for incorporation of co-operative marketing associations for marketing farm products; to provide for certain of such associations to have capital stock and others be without capital stock; to provide for membership in such associations and for government and restrictions of membership; to give certain powers to such associations and provide how they shall do business."

Its immediately pertinent provisions are found in section 15:

"That the association and its members may make and execute marketing contracts, requiring the members to sell, for any period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association. The contract may provide that the association may sell or resell the products of its members, with or without taking title thereto; and pay over to its members, with or without taking title thereto; and pay over to its members the resale price, after deducting all necessary selling, overhead and other costs and expenses including interest on preferred stock, not exceeding eight per cent. (8%) per annum, and reserves for retiring the stock, if any, and other proper reserves; and interest not exceeding eight per cent. (8%) per annum upon common stock; or other items deemed proper. The by-laws and the marketing contract may fix, as liquidated damages, specified sums to be paid by the member or stockholder to the association upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products; and may further provide that the member will pay all costs, premiums for bonds, expenses and fees in case any action is brought upon the contract by the association; and any such provisions shall be valid and enforceable in the courts of this state. In the event of any such breach or threatened breach of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract, and to a decree of specific performance thereof. Pending the adjudication of such an action and upon filing a verified complaint showing the breach or threatened breach, and upon filing a sufficient bond, the association

⬧For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

shall be entitled to a temporary restraining order and preliminary injunction against the member."

The contract exhibited by the bill of complaint embodies these provisions, and is in all respects within the authority granted by the act. The purpose of the association, and the obligations assumed by it and its members, so far as they are here material, are thus set forth in the contract:

"1. The grower is a member of the association and is helping to carry out the express aims of the association for co-operative marketing, for minimizing speculation and waste and for stabilizing cotton markets through this and similar organizations undertaken by other growers.

"2. The association agrees to buy and the grower agrees to sell and deliver to the association all of the *cotton produced or acquired* by or for him in Alabama during the years 1923, 1924, 1925, 1926, and 1927."

"5. The association shall pool or mingle the cotton of the grower with cotton of a like variety, grade and staple delivered by other growers. The association shall classify the cotton and its classification shall be conclusive. Each pool shall be for a full season.

"6. The association agrees to resell such cotton, together with cotton of like variety, grade and staple, delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions; and to pay over the net amount received therefrom (less freight, insurance and interest), as payment in full to the grower and growers named in contracts similar hereto, according to the cotton delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of organizing, incorporating and maintaining the association, costs of handling, grading and marketing such cotton; and of reserves for credits and other general purposes (said reserves not to exceed one per cent. of the gross re-sale price). The annual surplus from such deductions must be prorated among the growers delivering cotton in that year on the basis of deliveries."

"8. The association may sell the said cotton within or without this state, directly to spinners or exporters or otherwise, at such time and upon such conditions and terms as it may deem profitable, fair and advantageous to the grower; and it may exercise any powers or rights hereunder and sell all or any part of the cotton to or through any agency, now established or to be hereafter established, for the co-operative marketing of the cotton of growers in other states throughout the United States under such conditions as will serve the joint interests of the growers and the public, and any proportionate expense connected therewith shall be deemed marketing costs under paragraph 6."

"11. The grower shall have the right to stop growing cotton and to grow anything else at any time at his free discretion; but if he produces any cotton during the term hereof, it shall be all included under the terms of this agreement and must be sold only to the association."

"18(a). Inasmuch as the remedy at law *would be inadequate; and inasmuch as it is* now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association, should the grower fail to sell and deliver all of his cotton, the grower hereby agrees to pay to the association for all cotton delivered, sold, consigned, withheld or marketed by or for him, other than in accordance with the terms hereof, the sum of five cents per pound, middling basis, as liquidated damages for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the growers to each and all of the said contracts.

"(b) The grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of cotton, the association shall be entitled to an injunction to prevent breach or further breach hereof and to a decree 'for specific performance hereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go to the open markets and buy cotton to replace any which the grower may fail to deliver."

The bill charges that respondent has breached this contract in that he has raised a crop of cotton—about 15 bales—of which he has sold a portion to other persons, and is about to sell the remainder.

The prayer is for a writ of injunction commanding the respondent to sell and deliver his cotton to complainant, and to forbid him from selling it to any other person; and for an accounting as to the cotton already sold; and for general relief.

Respondent demurred to the bill of complaint on numerous grounds, which, so far as insisted upon, are in substance as follows: (3) It appears that the contract is not complete. (4) It is not a mutual contract. (1) The bill is without equity. (2) It shows an adequate remedy at law. (5) It is unjust and unreasonable. (6) It is too uncertain in its terms for specific enforcement. (7) It is in restraint of trade and tends to create a monopoly. (8) It is against public policy. (9) It is class legislation. (10) The act is unconstitutional.

The demurrer being overruled, respondent appeals.

W. L. Hogue and A. W. Stewart, both of Marion, for appellant.

Contracts lacking in mutuality, or requiring continuous personal performance, will not be specifically enforced. Elec. Light. Co. v. Mobile Ry., 109 Ala. 190, 19 So. 723, 55 Am. St. Rep. 927; Nabers v. Morris & Co., 103 Ala. 544, 15 So. 850. A plain and adequate remedy at law is provided by the contract. Code 1907, § 3052. The contract is unilateral, unfair, and unreasonable. Moon's Adm'r v. Crowder, 72 Ala. 89; Irwin v. Bailey, 72 Ala. 467; Carlisle v. Carlisle, 77 Ala. 339; Ellis v. Burden, 1 Ala. 458; Blackwilder v. Loveless, 21 Ala. 371. The contract is in restraint of trade. Const. 1901, § 103; Code

1907, § 5212; Amer. Ldy. Co. v. E. & W. Dry Cleaning Co., 199 Ala. 154, 74 So. 58.

Clifton C. Johnston, of Marion, and Steiner, Crum & Weil, 'of Montgomery, for appellee.

Respondent's contention for invalidity of the contract and the statute cannot be sustained. Brown v. Staple Cot. Ass'n, 132 Miss. 859, 96 So. 849; Texas Ass'n v. Stovall, 113 Tex. 273, 253 S. W. 1101; Tobacco Growers Ass'n v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; Ex parte Baldwin County Producers' Corp., 203 Ala. 345, 83 So. 69; Washington Cranberry Growers' Ass'n v. Moon, 117 Wash. 430, 201 P. 773, 204 P. 811, 25 A. L. R. 1077; Poultry Producers v. Barlow, 189 Cal. 278, 208 P. 93; Washington Co-op. Ass'n v. Taylor, 122 Wash. 466, 210 P. 806; Northern Wisc. Pool v. Bekkedal & Son, 182 Wis. 571, 197 N. W. 936; State v. Scollard, 126 Wash. 335, 218 P. 224, 32 A. L. R. 1082; Wheat Growers' Ass'n v. Schulte, 113 Kan. 672, 216 P. 311; Kansas Wheat Growers' Ass'n v. Floyd, 116 Kan. 522, 227 P. 336; Feagain v. Dark Tobacco Ass'n, 202 Ky. 801, 261 S. W. 607.

SOMERVILLE, J. [1, 2] The bill alleges that on May 8, 1923, "the defendant made and entered into a contract with complainant in the form in general use by complainant." This sufficiently shows a completed contract between the parties. This allegation is not contradicted by Exhibit A to the bill, which is referred to merely as a substantial copy of the form of the contract used by complainant in this instance and generally.

[3] Unquestionably the contract is mutual in its operation and in its benefits, since the promise of one party is always a sufficient consideration for the promise of the other.

[4] As for the objection that the contract is unjust and unreasonable, there is nothing in the apparent purpose, or the stated terms, or the indicated operation of the contract, which can support such a charge. Manifestly, it looks to the mutual advantage of all of the members of the association in the disposition of the cotton raised by them, by sale in the open market. The proceeds of the cotton sold by the association on account of its members during each year must be "prorated among the growers delivering cotton in that year on the basis of deliveries," subject to certain expenses in the operation of the association and the handling of the cotton. When the association borrows money on its cotton deliveries, as authorized by section 9 of the contract, for the benefit of the members, "the association shall prorate the money so received among the growers equally, as it may conclusively determine." The last clause in this provision certainly is not intended to give to the association any arbitrary power in the apportionment of that fund, and it will not be so construed.

The fund must be apportioned equally, according to the amount of cotton thus pooled, and for breach of that obligation the association would be liable to a member.

[5] It may be conceded, for the argument merely, that the character and terms of this contract, and the extent and duration of its mutual obligations, would ordinarily deter a court of equity from undertaking the specific enforcement of its several requirements by direct affirmative action. Electric, etc., Co. v. Mobile, etc., Ry. Co., 109 Ala. 190, 19 So. 723, 55 Am. St. Rep. 927; Am. Laundry Co. v. Dry Cleaning Co., 199 Ala. 154, 74 So. 58; Iron Age Pub. Co. v. W. U. T. Co., 83 Ala. 498, 510. 511, 3 So. 449, 3 Am. St. Rep. 758.

But the statute in this case gives the remedy by injunction to prevent threatened breaches of the contract by association members in the disposition of their cotton, and by their contract they have expressly assented thereto. We can see no practical difficulty in the specific enforcement of this single feature of the contract for a single season; and the objections based upon the want of mutuality or remedy, and the adequacy of the remedy at law, are eliminated by the terms of the statute and the contract made thereunder.

The undertakings and obligations of the association and of its members are clear and certain, and the remedies in question can be easily applied.

[6] So far as public policy is concerned, it is primarily determined in every state by the acts of its Legislature; no provision of its constitution forbidding. Denson v. Ala. F. & I. Co., 198 Ala. 383, 391, 73 So. 525. When the Legislature thus speaks, whether it be governed by age-old principle or by merely ephemeral expediency, it eliminates the question of public policy from the cognizance of courts in their administration of the legislative act. As a matter of fact, while some of the fundamentals of public policy will probably remain unchanged through all the ages, public policy is generally affected by the changing values of expediency; and hence a public policy which in one age prescribes certain conduct as injurious to the public welfare may in a later age, under changed economic and social condition, wisely and justly tolerate, if not encourage as beneficial, the identical conduct.

[7] The objections to the validity of this contract must therefore be narrowed to a single inquiry: Does the legislative act which authorizes the contract offend any inhibitory provision of the Alabama Constitution?

The only provision which is pertinent to the inquiry is to be found in Const. 1901, § 103:

"The Legislature shall provide by law for the regulation, prohibition, or reasonable restraint

of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, trade, or commerce, or from increasing unreasonably the cost thereof to the consumer, or preventing reasonable competition in any calling, trade, or business."

[8] The obvious effect of this provision is to deny to the Legislature the power to enact laws which would authorize this, or any other of the associations or combinations named, to bring about an artificial scarcity of articles of necessity, or commodities of trade, or to reasonably increase their cost to the consumer. There is no question here as to "preventing reasonable competition in any calling, trade or business." Manifestly, also, the operation of this association, for the purpose and within the lines prescribed by the act, has no tendency to create any scarcity of cotton, either by discouraging its production, or unreasonably withholding it from the market.

[9] The only remaining question, therefore, is whether it tends to unreasonably increase the cost of cotton to the customer by restraining the several members of the association from marketing their crops by independent individual action.

Co-operative marketing associations, composed of the growers of agricultural or fructicultural products, are now to be found in many of the states, and in every section of the country. Their origin and growth are unquestionably founded upon a pressing economic necessity. The whole subject was clearly and soundly reviewed by the late Chief Justice Clark of North Carolina, in Tobacco Growers' Co-op. Ass'n v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231, in which that association had filed its bill for specific performance and for the assessment of liquidated damages against nonconforming members under a co-operative contract practically identical in its form and in its provisions with the contract here exhibited, and authorized by a similar legislative act.

In that case it was said of the complainant association:

"Its sole purpose is by an orderly marketing of the crop to make a large saving, and to secure to the producers a fair and reasonable price therefor, without increasing the price the customer will pay for the manufactured article. The sole object of the association is to protect the producer of the raw article from depression in the price by the combination of the large manufacturing corporations, controlled by a few men, who can at the same time not only decrease the price to the producer, but can increase it at will to the customer, and thereby accumulate in a few hands sums beyond computation. The co-operative association purposes to eliminate unnecessary expense in selling and to prevent artificially forced reduction in the price paid to the producers. Instead of creating a monopoly, the object is by a rational method of putting the

213 ALA.—5

raw product on the market from time to time as there is a legitimate demand for its manufacture, and by the extension of credit to farmers to enable this to be done, to prevent a monopoly of the tobacco industry by those who manufacture it."

The learned Chief Justice, in discussing the ethical and economical aspects of the question, commented further as follows:

"The co-operative marketing system was forced into existence to guarantee fair prices to the producer, a fair wage for labor, and to prevent extortion upon the consumer. It increased consumption, by furnishing the consumer a regular supply at less price, and at the same time enabled the laborer and the farmer to obtain a remunerative return. In addition, the co-operative system eliminated unnecessary expenses and costs, as well as the enormous speculative profits realized by combinations which had taken control of the entire process between the producer and the consumer. For instance, when the cotton crop began to be marketed in October, the price dropped and the farmer was forced to sell to meet the bills he had incurred for fertilizers and the money borrowed for the payment of labor, and as it dropped there was a progressive pressure for further reduction in price, and the returns to the farmer were pitifully inadequate; but, when the cotton had thus been forced from the hands of the farmer upon the market, the great combinations, which had bought up the crop at the low prices, realized enormous profits by the sale of the cotton at high prices during the seasons when there was no longer cotton in the hands of the farmer. * * * In fact, the co-operative system is the most hopeful movement ever inaugurated to obtain justice for, and improve the financial condition of, farmers and laborers. The producers are paying all the costs and assuming all the responsibilities of these co-operative associations. They are taking all the risks. They are asking no assistance from the public treasury. They are forcing no one to join, and they are exacting no inordinate prices for their product. They are associating themselves as authorized by the statute, like other persons, and they have signed mutual and fair agreements among themselves, which will be futile unless those who have signed such agreements can be held to abide by the terms of their contracts."

In that case the court held that the contract was not an unreasonable restraint upon trade, and was not obnoxious to the constitutional inhibition of monopolies; and the right to specific performance was upheld.

In a recent case (Brown v. Staple Cotton Co-op. Ass'n, 132 Miss. 859, 96 So. 849) the Supreme Court of Mississippi had before it a co-operative contract substantially like the one here involved, and authorized by a similar act of the Legislature. Upon a full consideration of the subject it was held that the contract did not impose an unreasonable restraint upon trade, and was not detrimental to the public interest; and that the complaining association was entitled to the remedy of specific performance. Said the court:

"It will be seen that this court in construing our statute prohibiting monopolies has applied the rule of reason, as has the Supreme Court of the United States in construing the federal statute against monopolies, as have also the courts of other states in passing on co-operative marketing contracts substantially the same as the one here involved. There must be an unreasonable or undue restraint of trade. It must be such a restraint of trade as is detrimental to the public interest. * * * The Legislature must be given credit, if the language of the statute in question will permit, of legislating in the public interest. It is inconceivable that it was intended by our antitrust statute to condemn any and all contracts between two or more persons which might have the effect to hinder the freedom of trade even to the very smallest extent. Such a construction, as it will be seen at once, would lead to absurd results. It would destroy to a large extent the public welfare instead of promote it."

We do not overlook the fact that the constitutional provisions inhibiting trusts and monopolies, in the states of North Carolina and Mississippi, are not identical with ours; but very clearly neither of the decisions above referred to is grounded upon that distinction, but very clearly upon the principle that reasonable restraint of trade, looking to the reasonable protection of individual interests, and not unduly detrimental to the public interest, is not obnoxious to the law as it is now written and understood. That this is the consensus of modern judicial opinion is fully established by the authorities cited in those two opinions.

In Arnold v. Jones' Cotton Co., 152 Ala. 501, 504, 44 So. 662, 663 (12 L. R. A. [N. S.] 150), it was pertinently said:

"The test of reasonableness and the necessities of the interests to be protected, adopted in the modern decisions, necessarily refers to the court the peculiar circumstances of each case, in order to determine whether or not it is violative of the public policy of the country."

In that and, perhaps, other cases decided by this court, language is used in the characterization of contracts in restraint of trade, or in the prevention of fair competition, which may seem condemnatory of contracts such as the one before us. But the scope and purpose of the contract there considered, and the circumstances of the parties, were radically different from here; and, of quite decisive importance, the contract was not authorized by any act of the Legislature.

So far as we are advised, no American court has condemned a co-operative marketing contract of the character of this complainant association as injurious to the public interest, or in any way violative of public policy. On the contrary, such contracts have been everywhere upheld as valid, if not positively beneficial to the public interest.

Hollingsworth v. Texas Hay Ass'n (Tex. Civ. App.) 246 S. W. 1068; Anaheim Citrus Fruit Ass'n v. Yeoman, 51 Cal. App. 759, 197 P. 959 (hearing by Supreme Court denied); Tobacco Growers' Co-op. Ass'n v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; Poultry Producers v. Barlow, 189 Cal. 278, 208 P. 93; Ore. Growers' Co-op. Ass'n v. Lentz, 107 Or. 561, 212 P. 811; Washington Cranberry Growers' Ass'n v. Moore, 117 Wash. 430, 201 P. 773, 204 P. 811, 25 A. L. R. 1077; Burley Tobacco Soc. v. Gillaspy, 51 Ind. App. 583, 100 N. E. 89; Castorland Milk & Cheese Co. v. Shentz (Sup.) 179 N. Y. S. 131; Bullville Milk Ass'n v. Armstrong, 108 Misc. Rep. 582, 178 N. Y. S. 612; Burley Tobacco Growers v. Turner (Circuit Court of Kentucky).

Our case of Ex parte Baldwin County Producers' Corporation, 203 Ala. 345, 83 So. 69, though offering favorable analogy, is not an apt authority, for the reason that the contract there involved permitted members to sell their crops independently of the corporation. And, it may be observed, the corporation was organized under the general laws and not under a statute specially authorizing such a contract, as here.

Our conclusion is that the contract here exhibited is authorized by the act referred to, and that the act itself is not offensive to section 103 of the Constitution; and that therefore the demurrer to the bill was properly overruled.

[10] If it should in future appear, upon a proper bill of complaint, that this association is being used for unlawful purposes to the injury of the public interest, by creating a scarcity of cotton, or by unreasonably enhancing its market price, it will be the proper function of a court of equity to grant relief accordingly.

Affirmed.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.