7 So.2d 504
**DENTON v. ALABAMA COTTON CO-OP. ASS'N et al.**
**6 Div. 857.**

Court of Appeals of Alabama.
April 7, 1942.

430

B. M. Bains, of Oneonta, for appellant.

Steiner, Crum & Weil, of Montgomery, Leader, Hill & Tenenbaum, of Birmingham, and P. A. Nash and R. G. Kelton, both of Oneonta, for appellees.

RICE, Judge.

Appellant, plaintiff below, brought suit against Alabama Cotton Cooperative Association, Glen Parker, Oneonta Cotton Warehouse Company and E. L. Moore, seeking a recovery under Section 5697 of the Code of 1923 (now Title 7, Sec. 124 of the Code of 1940) as for a violation by the defendants of Section 5214 of the Criminal Code (now Title 57, Sec. 108 of the Code of 1940), both sections having relation to unlawful trusts, combines and monopolies.

The actual damage alleged is $1.50, to which plaintiff seeks to add the statutory penalty of $500 under the former Code Section.

The trial court sustained demurrers to the complaint, resulting in an involuntary non-suit, which ruling the appellant seeks to have reviewed.

There are a number of counts in the complaint as amended, but since appellant's argument centers on counts "D," "E" and "F," which are not materially different, they may be thus summarized: They allege that the plaintiff in October 1938 was engaged in the Town of Oneonta in performing the clerical work of filling out blank "certificates and waivers" to be used by the owners of cotton stored in public warehouses, seeking Government loans, for which he was to receive as compensation 25¢ per bale; that these certificates and waivers were expected to be signed by the warehousemen when accompanied by the certificate of a competent cotton classer; that plaintiff filled out some such certificates and waivers and presented them to defendant warehousemen with the certificate of classification by one Welsh, a duly licensed cotton classer, working in cooperation with plaintiff, but the warehousemen refused to recognize the classification by Welsh, and would recognize only that of their own cotton classer, one Parker, in consequence of which plaintiff lost his compensation of 25¢ per bale· on six bales of cotton. He alleges that this refusal on the part of the warehousemen was due to an "unlawful agreement" entered into by the defendants to "monopolize the business of preparing applications for loans and classifying cotton for the owners and producers of cotton stored or to be stored in the public warehouses in the Town of Oneonta on said date * * * and to restrain the management, prosecution or control of the plaintiff's business," and to guarantee the carrying out of such agreement, the defendant Moore and the McCay Warehouse (not sued) each placed in the hands of the defendant Parker a check for $200, "and on the part of Glen Parker, as agent for the Alabama Cotton Cooperative Association, he promised to so reduce the limit of the buying price of the buyer for the Alabama Cotton Cooperative Association as would practically take him out of the market."

No wrongful, illegal or improper motive or purpose on the part of the defendants, is alleged, nor any threats, force or intimidation, but merely that defendants (Cotton Association, Oneonta Warehouse Company and Moore) had selected their own agent or cotton classer, i. e., one Parker, and refused to deal in that respect, with the classification of Welsh. Nor does it appear whether the alleged agreement was verbal or in writing.

The defendants, jointly and severally, interposed numerous grounds of demurrer, taking the point, among others, that the complaint showed no violation of the statutes; no unreasonable and undue restraint; and that the defendants, acting individually or collectively, had the legal right to deal in the circumstances with whom they pleased and the right to select their own agent, representative or cotton classer without offending any statute or rule of public policy, and that what they did was only reasonably necessary for the fair protection of their own business interests; that it did not appear that the public was in any wise injuriously affected by the agreement.

The primary question to be determined, as we view it, is whether the acts of the defendants were obnoxious to the statutes, or were only reasonably and fairly necessary to the prosecution and protection of their own business.

 It is recognized that a person engaged in the business of classing cotton is required to possess some degree of expert knowledge, and he occupies, in a sense, a position of trust and confidence. He is required to keep records and hold duplicate samples for future inspection. Should he make an improper classification, the result may not only lead to annoyance and

confusion, but possible serious loss. This is further emphasized by the requirement of the statute (Agricultural Code of Alabama 1927, Sections 381, 382 etc., page 156, Code 1940, Tit. 2, §§ 179, 180, et seq.; and Acts 1935, page 20, Code 1940, Tit. 2, § 178) that he submit to an examination before a Board of Examiners created for the purpose, and obtain a license from the Department of Agriculture, as a condition precedent to engaging in the business of classing cotton; and he was expressly forbidden to engage in the business of a "public cotton classer" without being so licensed. Likewise he was required to obtain a license under the Federal Act, U.S.C.A. Title 7, §§ 252 and 253. His license, as counsel suggest, may be suspended or revoked at any time, and could be by letter or by wire, and yet, still being in possession of that license, he could in fact, if so disposed, continue to act, insofar as the public was concerned. It was therefore, it would seem, manifestly important to the defendant warehousemen whose certificate was sought, as also to the Cotton Cooperative Association, in the protection of the interest of its members, to be assured that their cotton was being properly classified by one concerning whom they had full confidence and some personal knowledge, and to that end it was not unreasonable—if any reason were necessary—that they should have the right to select their own representative, to the exclusion of Welsh or others.

■ The public policy of the State is found in its constitution, statutes and judicial decisions, and it is now well settled that not every agreement or combination, in some degree, restraining trade or competition, is forbidden. To render it unlawful, there must be an undue and unreasonable restraint and not fairly and reasonably necessary to the protection of one's own legitimate affairs. The "rule of reason" is now generally applied. And in determining whether a contract is reasonable or unreasonable, the court should consider the motive of the parties, the extent and effect of the contract, the circumstances under which it is made, and its effect upon the public interest.

In Warren v. Alabama Farm Bureau Cotton Association, 213 Ala. 61, 104 So. 264, 268, the Supreme Court, considering the effect of the contract between the Association and its members in this respect, said: "Reasonable restraint of trade, looking to the reasonable protection of individual interests, and not unduly detrimental to the public interest, is not obnoxious to the law as it is now written and understood. That this is the consensus of modern judicial opinion is fully established by the authorities." The court in that case quoted approvingly this statement by the Supreme Court of Mississippi [Brown v. Staple Co-op. Ass'n, 132 Miss. 859, 96 So. 849]: "It will be seen that this court in construing our statute prohibiting monopolies has applied the rule of reason, as has the Supreme Court of the United States in construing the federal statute against monopolies, as have also the courts of other states in passing on cooperative marketing contracts substantially the same as the one here involved. There must be an unreasonable or undue restraint of trade. It must be such a restraint of trade as is detrimental to the public interest. * * * The Legislature must be given credit, if the language of the statute in question will permit, of legislating in the public interest. It is inconceivable that it was intended by our anti-trust statute to condemn any and all contracts between two or more persons which might have the effect to hinder the freedom of trade even to the very smallest extent. Such a construction, as it will be seen at once, would lead to absurd results. It would destroy to a large extent the public welfare instead of promote it."

■ So, too, it seems well settled that it is not unlawful for any number of persons, without an unlawful object in view, to associate and agree that they will not work for, employ or deal with certain individuals or classes of individuals. "It is a part of every man's civil rights, that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason or is the result of whim, caprice, prejudice or malice. With his reasons, neither the public nor third persons have any legal control." Cooley on Torts, 2nd Ed., page 328. "As one person may refuse to have business relations with another, so two or more may combine or agree together not to deal with a particular person, for any reason they see fit, and no action will lie either to prevent the carrying out of this provision or for damages consequent upon its performance." Cooley on Torts, 4th Ed., Sec. 231.

In 15 C.J.S., Conspiracy, p. 1016, Subsec. (e) of § 12, it is said: "Every person has

the right to deal or refuse to deal with whom he chooses, and it is not unlawful for a combination to cease to patronize one against whom the concert of action is directed where the primary object is to advance the legitimate interests of the combination, and no illegal means are used. Even though the person against whom the concert of action is directed sustains financial loss, he will be without a remedy either in a court of law or a court of equity; a combination between persons merely to regulate their own affairs is allowable and a lawful combination, although others may be affected indirectly thereby." This general principle is supported by many authorities, some of which are: American Laundry Co. v. E. & W. Dry-Cleaning Co., 199 Ala. 154, 74 So. 58; Grant Const. Co. v. St. Paul Building Trades Council, 136 Minn. 167, 161 N.W. 520, on rehearing at page 1055; Lewis v. Huie-Hodge Lbr. Co., 121 La. 658, 46 So. 685; McGee v. Collins, 156 La. 291, 100 So. 430, 34 A.L.R. 336; II Page on Contracts, Sec. 781, et seq.; Kingston Ave. Wines & Liquors Co. v. Federated Liquor Package Stores, 170 Misc. 124, 9 N.Y.S.2d 1013; Palmer v. Atlantic Ice, etc., Corp., 178 Ga. 405, 173 S.E. 424, 92 A.L.R. 176; Robitaille v. Morse, 283 Mass. 27, 186 N.E. 78; Leech v. Farmers' Tobacco Warehouse Co., 171 Ky. 791, 188 S.W. 886; Terre Haute Brewing Co. v. McGeever, 198 Ala. 474, 73 So. 889; Arkansas Brok. Co. v. Dunn & Powell, 8 Cir., 173 F. 899, 35 L.R.A.,N.S., 464; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734.

We conclude that the agreement in question does not violate the provisions of the statutes referred to, and consequently any legal rights of the plaintiff, and that the ruling of the trial court, in the respect pointed out, was correct.

In the view we take of the case, it is unnecessary to consider the other grounds of demurrer, except, we may add, that the complaint wholly fails to show whether the alleged agreement was verbal or in writing. The defendants, very clearly, had the right, especially in a case of this nature, to be informed fully with respect to the character of the alleged agreement; and the ground of demurrer taking this point was properly sustained. If, of course, any ground of a demurrer is well taken, there is no error in sustaining the demurrer generally.

Finding no error in the record, the judgment of the circuit court is affirmed.

Affirmed.