176 So.2d 483

**ALABAMA ELECTRIC COOPERATIVE,
INC. et al.**

**v.**

**ALABAMA POWER COMPANY et al.**

**3 Div. 96.**

Supreme Court of Alabama.

Sept. 10, 1964.

Rehearing Denied April 8, 1965.

Opinion Extended on Further Denial of
Rehearing June 30, 1965.

Adams, Gillmore & Adams, Grove Hill, and Rushton, Stakely & Johnston, Montgomery, for Ala. Elec. Coop.

Jas. T. Hardin, Montgomery, for Director of Finance.

Martin, Balch, Bingham & Hawthorne, Birmingham, and Steiner, Crum & Baker, Montgomery, for Ala. Power Co.

Goodwyn & Smith, Montgomery, for Gulf Power Co.

MERRILL, Justice.

This is an appeal by Alabama Electric Cooperative, Inc. and Seymore Trammell, as Director of Finance of the State of Alabama, from a judgment of the Circuit Court of Montgomery County, quashing and holding for nought the order of former Finance Director, Maurice Patterson, granting consent for appellant to issue bonds amounting to $20,350,000 to construct a steam electric generating plant and over 700 miles of electric transmission lines and related facilities in Alabama and Florida.

Appellant AEC filed its petition with the Department of Finance on February 5, 1962. Alabama Power Company was allowed to intervene on March 28, and Gulf Power Company was permitted to intervene in September, 1962. After various proceedings and hearings, Maurice Patterson, the Finance Director on January 9, 1963, approved the petition of appellant based upon the findings that:

"4. That the plan and program of petitioner as set forth in said petition involves the supply of electric energy and the promotion and extension of the use thereof.

"5. That said plan or program of petitioner serves some public need and is in the public interest.

"6. That the issuance of the note or notes and the use of the proceeds thereof as set out in said petition will be in the furtherance of the corporate powers and purposes of petitioner, will serve some public need and will be in the public interest."

The appellees filed a petition for certiorari to the Circuit Court of Montgomery County and on July 9, 1963, that court quashed the order of the Finance Director and remanded the cause to the Director with directions to enter an order denying the petition. Maurice Patterson had been succeeded as Finance Director by Seymore Trammell and on August 6, 1963, AEC and Finance Director Trammell appealed to this court.

Alabama Electric Cooperative filed its petition with the Department of Finance pursuant to Tit. 55, § 155, Code 1940, as amended, which provides that no bonds of any authority such as AEC shall be issued without the consent of the Finance Department, given after the filing of a petition and a public hearing. "The department of finance shall grant such consent only after it finds that such issue or sale serves some public need and is in the public interest."

The following legal principles govern us in this review:

■ (1) On appeal to this court, we must review the judgment of the circuit court without any presumption of its correctness, since that court was in no better position to review the order of Director of Finance than we are. Alabama Public Service Com'n v. Decatur Transfer & Storage, Inc., 257 Ala. 346, 58 So.2d 887; Alabama Public Service Com'n v. Nunis, 252 Ala. 30, 39 So.2d 409.

■ (2) When we review the proceedings of an inferior tribunal on common law writ of certiorari, and the record shows jurisdiction and that the proceedings were valid and regular, the order of the lower tribunal should be sustained if there is any substantial evidence to support the order.

Baker v. Denniston-Boykin Co., 245 Ala. 407, 17 So.2d 148; Alabama Power Co. v. City of Fort Payne, 237 Ala. 459, 187 So. 632, 123 A.L.R. 1337.

▬ (3) The supervisory jurisdiction of the court on certiorari is restricted to an examination into the external validity of the proceeding had in the lower tribunal. It cannot be exercised to review the judgment as to its intrinsic correctness, either on the law or on the facts of the case. In this respect the supervisory powers of the court should not be confused with its appellate jurisdiction. And when the court examines the evidence, it does so, not to determine the probabilities preponderate one way or the other, but merely to determine whether the evidence will justify the finding as a legitimate inference from the facts proved regardless of whether such inference would or would not have been drawn by the appellate tribunal. Byars v. Town of Boaz, 229 Ala. 22, 155 So. 383; Ex parte Watkins, 268 Ala. 567, 109 So.2d 671, 10 Am.Jur., Certiorari, Sec. 3, pp. 525, 526.

▬ The basic question before us is whether there was any substantial evidence before the Director of Finance to sustain his finding that the issuance of the bonds "serves some public need and is in the public interest." We have concluded that there was such evidence.

The record consists of over 3,200 pages with other voluminous exhibits certified separately. We list some of the evidence merely to show that the evidence, if believed by the Director of Finance, was sufficient to support his finding and that his finding was not arbitrary and capricious.

1. The evidence shows that the REA Administrator has contracted to lend AEC $20,350,000 to construct electric facilities and that these facilities will serve approximately 77,000 individual consumers (42,900 present and 34,700 future consumers) living in most of the counties in South Alabama and Northwest Florida; that the need and demand for electric power is growing in the State and an additional supply is beneficial to the State.

2. Many elected public officials and other representative citizens in the area testified that the proposal was in the public interest and filled some public need, and there were numerous resolutions of county and city governing bodies, industrial development boards, civic clubs and farmer associations to like effect.

3. Thirty-five year contracts signed by each of the electric distribution cooperatives to be served were introduced into evidence. The cooperatives expressed their desire to serve themselves rather than to be dependent on appellees, whom they consider to be an unfriendly source of wholesale power.

4. Appellants' engineer testified that the construction of the proposed plant and related facilities would provide a payroll of approximately $5,000,000 during construction, create from 25 to 30 new permanent jobs and that the new plant would consume about 225,000 tons of Alabama coal annually; that the State would be benefited by increasing the available power supply; that it would make available a new source, since they would contract for one-half the output of electric power from the Walter F. George Dam on the Chattahoochee River and that the cooperative could and would sell power cheaper to its patrons than they were now paying appellees for the power.

In fairness to appellees, it should be stated that they contested the evidence adduced by appellants and made a strong case for their position that the issuance of the bonds would not serve a public need and would not be in the public interest. They also had testimony from public figures, resolutions, etc. from many organizations supporting their contentions. The decision of the Director of Finance was not an easy one, but once made, we are convinced that there was substantial evidence to support it, even though this court might not have

drawn the same inference from all the facts. As already shown, in reviewing by common law certiorari, neither the circuit court nor this court weighs the evidence and substitutes its judgment for that of the Finance Director.

Appellees contend that the expenditure of public funds to construct electric facilities to furnish electric service to persons receiving adequate central station service is in violation of the federal law authorizing such expenditure. Central station service is defined as electric service from a generating station transmitted or distributed over a wide area, as distinguished from the generation of power by a small individual generating unit, for example a Delco plant.

Appellees' contentions are based upon the provision in the federal law (7 U.S. C.A. § 904) that the administration is authorized and empowered to make loans for rural electrification to persons and cooperative associations "for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central station service" and it further provides that no loan for a generating plant shall be made unless the consent of the State authority having jurisdiction is first obtained. Appellees argue that they are either furnishing the central station service to most of the territory covered or that they are prepared to do so.

This very question was decided in Kansas City Power & Light Co. v. McKay, D.C., 115 F.Supp. 402, where the court said:

"1. Whether the loan contracts violate the central station service provision of the RE Act. 7 U.S.C.A. § 904.

"Plaintiffs first contend that by means of loan agreements REA undertakes to loan REA funds to construct electric facilities to serve persons in rural areas where central station service is not only available but where, in many cases, it is presently received. In this regard, the position of plaintiffs is that where, as in the case at bar, a private utility supplies power and energy to a federated cooperative which in turn meets the needs of its respective members by furnishing them with current over distribution systems initially financed by an REA loan, the purpose of the RE Act is fulfilled and that any further loans to any of the cooperatives constitute a violation of the central station service provision. Plaintiffs' position appears to be based upon the premise that central station service as contemplated in the Rural Electrification Act is thus being received by the rural area supplied by this distribution system as well as by the federated cooperative. With this postulate the Court is unable to agree. * * *

\* \* \* \* \* \*

" \* \* \* Consequently, the Court finds that the course pursued by the Administrator in authorizing the loans under discussion under this heading is not violative of the Act, and that the loan contracts do not violate the central station provision of the RE Act."

The case was appealed to the District of Columbia Circuit Court of Appeals. That court did not reach the merits of the case and reversed, holding that the eight power companies did not show a sufficient interest to enable them to sue to enjoin the execution of the power contracts. The court said:

"It is indisputable that the essence of plaintiffs' complaint is the competition which they will suffer if the Government's contracts are carried out. They can claim no other interest or injury. The defendants have not undertaken to regulate them in any way. They have not been ordered to abandon any of their activities or to forego the expansion programs planned by them. They have not been subjected to any

obligation or duty. Their sole interest and objective is to eliminate the competition which they fear. Controlling decisions of the Supreme Court, dealing with other electric power contracts of the Federal Government, establish that an interest of this kind is not sufficient to enable them to sue to enjoin execution of the power contracts and program of the Government. See Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Duke Power Co. v. Greenwood County, 1938, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381; Tennessee Electric Power Co. v. T. V. A., 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543." Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied 305 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780.

Thus, we have a decision on the merits in the District Court that the contract does not violate the central station provisions of the federal statute, and a Circuit Court of Appeals decision that power companies do not have such an interest as to enable them to enjoin the execution of such contracts as were entered into in the instant case. Certiorari was denied by the Federal Supreme Court.

It has been consistently held that the legality of a loan approved by the Administrator of the REA is not subject to a collateral attack in a hearing before a public service commission or the duly constituted state authority which, in Alabama, is the Director of Finance. Re Southern Maryland Elec. CO-OP., Inc., 49 PUR 3d 163; Re Missouri Electric Power Co., 50 PUR (NS) 257; Re Iowa Utilities Co., 47 PUR (NS) 321; State ex rel. Consumers Public Service Co. v. Public Service Commission, 352 Mo. 905, 180 S.W.2d 40; Missouri Power & Light Co. v. Lewis County R. E. C. Ass'n., 235 Mo.App. 1056, 149 S.W.2d 881. In each of these decisions, the question of the violation of the central station-service feature of the federal act was raised but, in each instance, the decision was in favor of the cooperatives. In view of the authorities cited supra, we feel that we cannot agree with the contention of appellees that this is a question on which we should pass.

It follows that the learned trial court erred in ordering the order of the Finance Director to be quashed. The judgment of the circuit court is reversed and one is here rendered affirming the order of the Director.

Reversed and rendered.

LAWSON, SIMPSON, GOODWYN, COLEMAN and HARWOOD, JJ., concur.

LIVINGSTON, C. J., dissents.

On Rehearing.

MERRILL, Justice.

Appellee Alabama Power Company argues strenuously that we have overruled the holdings in Alabama Power Co. v. City of Fort Payne, 237 Ala. 459, 187 So. 632, 123 A.L.R. 1337, and Alabama Electric Cooperative, Inc. v. Alabama Power Co., 251 Ala. 190, 36 So.2d 523, that Alabama Power Company does not have the right to intervene in a proceeding before the Director of Finance as was done in those cases and in the instant case. We have not overruled those cases and we remain of the opinion that Alabama Power Company and Gulf Power Company had the right to intervene and be heard in this cause.

In addition to the more or less general reasons stated in our original opinion showing that the approval of the issuance of the bonds "serves some public need and is in the public interest," we note other examples of testimony. Such testimony fills Vol. III of the record, and only a few excerpts are here listed.

1. The Cooperative's engineer, C. M. Stanley, who holds an Alabama license, and was fully qualified as an electrical engineer, testified that if AEC purchased its deficiencies (power required in excess of that which it generates) from Alabama Power Company rather than to build an additional

plant and purchase power from SEPA, over a ten year period, the resulting costs to AEC would be increased five million four hundred forty-five thousand dollars.

2. He further testified that AEC's plan to increase its generating and transmission facilities would bring about practically no duplication of Alabama Power Company's existing system. He stated that any duplication "is of a minimal nature."

3. W. P. Albritton, city councilman from Frisco City, testified that they had only one line from Frisco City to Andalusia. If these improvements were made, they could have two lines. When the current from the one line went off, their small industries, which employed about 400 people, were closed until repairs were made, and a two-line feed would remedy this situation. Also, the new small industries there used twice as much electricity now as the entire town formerly used.

4. Businessmen, city and county officials testified that a competitive source of power would be good for their communities and the area.

5. Many witnesses testified that there was a growing need for electrical power in their area, that their relations with their cooperatives were good and their continued growth depended upon an adequate supply of electricity. For example, Troy doubled the capacity of their transmission lines in two years.

6. The need for additional power for rural and farm homes was also shown together with evidence that the standard of living had increased sharply in rural sections since the cooperatives had begun functioning.

This type of evidence was given from witnesses all over South Alabama. Some witnesses may have been overenthusiastic and their figures may not have been exactly accurate, but it is impossible to read the testimony presented to the Finance Director in behalf of the application and not hold that there was substantial evidence,

if believed by the Director of Finance, that the issuance of the bonds in question would serve some public need and be in the public interest.

Application for rehearing overruled.

LAWSON, SIMPSON, COLEMAN and HARWOOD, JJ., concur.

LIVINGSTON, C. J., and GOODWYN, J., dissent.

LIVINGSTON, Chief Justice (dissenting):

There is no conflict or dispute in the record as to the following:

AEC seeks to borrow from the Federal Government $20,350,000 to build a steam generating plant and over 700 miles of transmission lines to duplicate facilities which Alabama Power Company already has constructed or has committed to construct with funds from private investors. AEC seeks to use these funds in order to supply electricity in seven counties in Alabama and three counties in Florida in which it has never operated. As I see it, the sole justification for this expenditure of Federal funds is the desire of AEC to compete with and to duplicate investor-owned utilities. As proof thereof, there is no evidence in this record which shows or tends to show that one person who lives in the rural area will receive electricity by this multimillion dollar expenditure who is not today already receiving electric service.

So long as any investor-owned utility in Alabama is ready, willing and able to furnish electric service to consumers at reasonable rates—as prescribed and continuously regulated by the Public Service Commission—then there is no public need, nor is it in the public interest for a cooperative to borrow from the Federal Government and to build duplicating or competing generating and transmission facilities. This is the proper construction of Sec. 155 of Title 55, and this is my understanding of the holding in prior cases of Alabama Power

Co. v. City of Ft. Payne, 237 Ala. 459, 187 So. 632, 123 A.L.R. 1337; Alabama Electric Cooperative v. Alabama Power Co., 251 Ala. 190, 36 So.2d 523.

I respectfully dissent.

GOODWYN, Justice (dissenting):

Of concern here is a state statute (Code 1940, Tit. 55, § 155) requiring approval of the proposed loan by the State Director of Finance and containing the following pertinent provisions:

" * * * Such consent shall be granted only after a public hearing and after a petition requesting such consent has been duly filed by the corporation, authority, district, commission or other body seeking such consent with the department more than five days before such public hearing. *Such petition shall specify* the plan or program of the body seeking such consent and *the uses to which it is proposed to put the proceeds of such issue* and such other matters as are necessary to fully advise such department of the nature of the proposed project and said petition shall include such other information as may be required by the rules of the department. The department of finance shall grant such consent *only* after it finds that such issue or sale serves some public need *and is in the public interest. It shall be unlawful* for the body seeking such consent or anyone *to use the proceeds* of any such issue or sale *contrary to the plan and purposes presented to the department in obtaining its consent* thereto, * *." [Emphasis supplied.]

The modified and extended majority opinion, as I understand it, in effect holds it is of no consequence, in determining whether the loan should be approved, that the proposed use of the borrowed funds, as disclosed by the evidence, is contrary to the federal law (7 U.S.C.A. § 904) authorizing the loan or is contrary to the purposes stated in the petition to the Finance Director (§ 155, Tit. 55, supra). In other words, the Finance Director is rendered impotent to find that the loan is not "in the public interest" even if the evidence shows the proceeds will be used for purposes contrary to the Rural Electrification Act (7 U.S.C.A. § 904, supra) and contrary to the purposes stated in the petition to the Finance Director. I am unable to agree with this. My view is that § 155, Tit. 55, supra, in requiring that such loan shall serve some public need *and shall be in the public interest,* declares the public policy of this state (Warren v. Alabama Farm Bureau Cotton Ass'n, 213 Ala. 61, 64, 104 So. 264; Denson v. Alabama Fuel & Iron Co., 198 Ala. 383, 391, 73 So. 525); Denton v. Alabama Cotton Co-op. Ass'n, 30 Ala.App. 429, 432, 7 So.2d 504; 16 Am. Jur.2d, Constitutional Law, § 167, p. 379; 82 C.J.S. Statutes § 9, p. 24; 72 C.J.S. Policy, p. 214); and that the legislature surely could not have intended that a proposed loan, the proceeds of which will be used for an unauthorized or unlawful purpose (whether under the federal law or the state law), can be said to be in the public interest. The Finance Director acts under the state statute, and action taken by him must be in conformity with the public policy there declared. Significantly, the Rural Electrification Act specifically requires approval of the loan by "the State Authority having jurisdiction in the premises." This obviously means the State Director of Finance, as provided for in § 155, Tit. 55, supra.

It is of note that appellant's petition to the Director of Finance shows that the proposed facilities are to be used "for the purpose of furnishing electric energy to consumers not receiving central station electric service." [Also, the loan contract provides that the loan is to finance the construction and operation of an electric system "for the purpose of furnishing electric energy to persons in rural areas not receiving central station electric service."] This stated purpose is in accord with the require-

ments of the Rural Electrification Act (7 U.S.C.A. § 904, supra).

It is my view, also, that when a petition specifies the use "to which it is proposed to put the proceeds" of a proposed loan, as is required by § 155, Tit. 55, supra, the petitioner thereby assumes the burden of showing, at the public hearing provided for by § 155, that the proceeds will be used for the stated purpose. If that premise is correct, and I do not see how it could be otherwise, how can it be said that the Finance Director, in determining whether the proposed use is "in the public interest," cannot consider the evidence on the issue presented by the petition itself? In this connection, it seems appropriate to note again that § 155, Tit. 55, supra, makes it unlawful for a petitioner to use the proceeds of a loan "contrary to the plan and purposes presented" in obtaining the Finance Director's consent to such loan. When the evidence shows that the proceeds will not be used according to the "plan and purposes" stated in the petition, whereby the intended use would be unlawful, how can it be said that the loan is "in the public interest"? The doing of something unlawful cannot be "in the public interest."

As I see it, there is really no question of a collateral attack being made on the legality of the loan contract. The contract, as already noted, shows that the loan is being made for a purpose consistent with the requirements of the Rural Electrification Act; and as already noted, the petition to the Finance Director also shows this. The question is simply whether there is evidence to support a finding that the proposed loan "is in the public interest," as required by § 155, Tit. 55, supra; and I do not see how that question can be resolved without considering the evidence on the issue of proposed use presented by the petition.

This further question is posed: What would be the holding in a case where the Finance Director *denies* approval of a proposed loan, such as the one here involved, on the ground the evidence shows

that the proceeds of the loan will not be used for the prescribed (by 7 U.S.C.A., § 904, supra) and proposed (by the petition) purpose of financing the construction and operation of facilities "for the furnishing of electric energy to persons in rural areas who are not receiving central station service" and, therefore, cannot be said to be "in the public interest"?

I concurred in the original opinion but find, after further consideration on this rehearing, that I must register disagreement as above indicated. Therefore, I respectfully dissent.