**ALABAMA POWER COMPANY,**
Appellant,

v.

**ALABAMA ELECTRIC COOPERATIVE,**
**INC., et al., Appellees.**

No. 23016.

United States Court of Appeals
Fifth Circuit.

April 2, 1968.

S. Eason Balch, John Bingham, Birmingham, Ala., Frank H. Hawthorne, Montgomery, Ala., James H. Hancock, Birmingham, Ala., for appellant.

Bennett Boskey, Washington, D. C., J. M. Williams, Jr., Montgomery, Ala., L. A. Beers, Jr., Andalusia, Ala., Alan S. Rosenthal, Harvey L. Zuckman, Attys., Dept. of Justice, Washington, D. C., for appellees.

Before RIVES, GEWIN and GODBOLD, Circuit Judges.

RIVES, Circuit Judge:

Alabama Power Company (hereafter Power Company) filed its complaint against Rural Electrification Administration (REA), Alabama Electric Cooperative, Inc. (AEC), Norman M. Clapp, the Administrator of REA, the Department of Agriculture and the Secretary of Agriculture. The complaint prayed for a preliminary and permanent injunction restraining the consummation or use of a $20,350,000.00 loan from REA to AEC for the purpose of financing the construction and operation of a generating plant and high voltage electric transmission and distribution lines. It prayed separately for a judgment avoiding certain 35-year all-requirements electric power contracts between AEC and fourteen electric distribution cooperatives as violative of the antitrust laws, and sought to recover from AEC treble damages, costs and attorneys' fees.

The defendants moved to dismiss and, alternatively, for summary judgment. Affidavits were filed in support of and in opposition to the plaintiff's motion for preliminary injunction and the defendants' motions for summary judgment. The district court, in an opinion reported in 249 F.Supp. 855, denied plaintiff's motion for preliminary injunction and granted the several motions of the defendants to dismiss the action. The district court held that the Power Company had no standing to enjoin the consummation of the REA loan. The 35-year all-requirements electric power contracts the district court held were the result of valid governmental action and, hence, not violative of the antitrust laws. Since we are in agreement with the district court, what was said in its able opinion need not be repeated and our opinion can · be brief.

Power Company argues that it has standing to seek judicial review of the REA loan either as made in violation of the "central station service" limitation contained in Section 4 of the REA

Act,[1] or as being conditioned upon a violation of the antitrust laws.[2] As to the claim of standing under the REA Act, it has been repeatedly held that increased competition which may result to a private power company does not give it sufficient standing to enjoin the making of a loan by a federal agency.[3] The answer to the claim of standing under the antitrust laws was indicated in Kansas City Power & Light Co. v. McKay, supra note 3, and was clearly furnished in the Fifth Circuit case decided some months after the district court's decision in the instant case, Rural Electrification Administration v. Central Louisiana Electric Co., supra note 3. There, this Court said:

"From the entire history of the Rural Electrification Act and its administration we are totally convinced that Congress has never enacted or intended that loans by this Agency should be reviewable in the courts. The Act itself makes no provision for judicial loan review. By the allegations of the Complaints we are informed of the thorough manner in which Congress has ridden herd on the REA. Congressional Committees caused the promulgation of REA Bulletin 111–3, which appellees now say has been violated. Certainly, the demands of Congressional Committees do not have the force of law. Congress has seen fit not to enact these particular demands into law, evidently being most content to rely on the deadly sword constantly in its own hands, that is, the sole control of the purse out of which the loans are made. Regardless of how outrageous or unfair the making of this loan may seem,

the remedy is not in the courts but in the Congress." 354 F.2d at 865.

The same thought had been earlier expressed by the D.C. Circuit in the Kansas City Power & Light Co. case, supra. See 225 F.2d at 930, 931. As later said by the Eighth Circuit in Rural Electrification Administration v. Northern States Power Co., 1967, 373 F.2d 686, 700:

"Congress has steadfastly refused to provide judicial review under 7 U.S.C. § 901 of the REA Act.[26] This si-

lence could be premised on the concern that the private supplier could otherwise interfere with REA loans in each instance where the Administrator finds the public suppliers proposal unreasonable."

---

1. 7 U.S.C.A. § 904.

2. Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C.A. §§ 1, 2 and 14.

3. Alabama Power Company v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Duke Power Company v. Greenwood Co., 1938, 302 U.S. 485, 58 S.Ct. 306, 82 L. Ed. 381; Tennessee Electric Power Co.

v. TVA, 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543; Kansas City Power & Light Co. v. McKay, 1955, 96 U.S.App. D.C. 273, 225 F.2d 924, cert. den., 350 ·U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780; Rural Electrification Administration v. Central Louisiana Electric Co., 5 Cir. 1966, 354 F.2d 859. See also Hardin v. Kentucky Utilities Co., 1968, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787.

"26. See, e. g., Schilling v. Rogers, 363 U.S. 666, at 674. 80 S.Ct. 1288, at 1294, 4 L.Ed.2d 1478, where Justice Harlan said:
"'The point is that in this Act [Trading with the Enemy Act] Congress was advertent to the role of courts, and an absence in any specific area of any kind of provision for judicial participation strongly indicates a legislative purpose that there be no such participation * * * [citing Work v. United States ex rel. Rives, 267 U.S. 175, 182, 45 S.Ct. 252, 69 L. Ed. 561].'
In 1962 and 1963 attempts were made to introduce bills into Congress amending the Rural Electrification Act to provide for public hearings and judicial review of orders approving loans. These bills were not reported out of committee. See Hearings on Food and Agriculture Act of 1962 before House Committee on Agriculture, 87th Cong., 1st Sess., pp. 680–681. See also H.R. 6852 and H.R. 7213, 88th Cong., 1st Sess.; Hearings before House Appropriations Committee on Department of Agriculture Appropriations for 1964, 88th Cong., 1st Sess., p. 374.

■ In brief, review under the Administrative Procedure Act of 1946, 5 U.S.C.A. § 1009, is precluded by that statute's initial exception to the right of review: "Except as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion * * *." The REA Act, 7 U.S.C.A. § 904, commits to the discretion of the Administrator the making of loans for rural electrification, including the adequacy of the security for such loans. The statute not only fails to provide for judicial review, but when construed in the light of its purpose and of legislative history, the statute retains oversight of the Administrator's actions in the hands of Congress itself and precludes judicial review.

■ The same rationale would deny the plaintiff Power Company standing to enjoin the consummation of the loan or its claimed invalid provision for security directly under the antitrust laws. Further, it is settled that neither the Sherman Act nor the Clayton Act was intended to authorize restraint of governmental action.[4] A different question might be presented if the Administrator went beyond the outer perimeter of the authority vested in him by the statute,[5] or as expressed in Hardin v. Kentucky Utilities Co., cited supra note 3, " * * * outside the range of permissible choices contemplated by the statute." The Administrator's affidavit discloses that that condition does not arise under the circumstances of this case.

"My policy reasons for approving the aforesaid loan were: (1) it would result in significant savings in the cost of power to AEC and the Members as compared with the cost of power purchased by AEC and the Members from the plaintiff and Gulf Power Company; and (2) the loan was necessary to protect the effectiveness and security of AEC and the Members since the plaintiff had through its activities demonstrated its intent to deprive AEC and the Members of existing and potential consumers in their service areas, and since continuance of dependence by AEC and the Members upon plaintiff as a wholesale supplier would inevitably assist and facilitate such activities on the part of the plaintiff.

"As authorized by section 4 of the RE Act (7 U.S.C. 904), the loan to AEC is to be repaid over a period of thirty-five (35) years. It has been the practice for many years of REA Administrators, including the affiant, to require as a condition of making generating and transmission loans pursuant to section 4 to cooperatives such as AEC, that the borrower shall obtain 35 year contracts with its members (hereinafter called 'thirty-five year, all-requirements contracts') obligating them to purchase all of their electric requirements to the extent that the borrower shall have power and energy available. The purpose of this requirement is to assure that the borrower will have a market for the power generated and transmitted by the REA-financed facilities and thus be able to repay the loan. Such a requirement is established customarily, and was imposed on AEC in this case, in the exercise of the REA administrator's power and obligation under section 4 to obtain reasonably adequate security for the loan and

---

4. United Mine Workers of America v. Pennington, 1965, 381 U.S. 657, 671–672, 85 S.Ct. 1585, 14 L.Ed.2d 626; Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 1961, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464; Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; United States v. Rock Royal Co-op, 1939, 307 U.S. 533, 559–560, 59 S.Ct. 993, 83 L.Ed. 1446; E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 1 Cir. 1966, 362 F.2d 52; Stroud v. Benson, D.C.N.C.1957, 155 F. Supp. 482; Miley v. John Hancock Mut. Life Ins. Co., D.C.Mass.1957, 148 F. Supp. 299.

5. See S & S Logging Co. v. Barker, 9 Cir. 1966, 366 F.2d 617; Norton v. McShane, 5 Cir. 1964, 332 F.2d 855, 859; compare Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288.

to assure its repayment within the time agreed upon between REA and AEC. As further assurance, following long-established REA practice, I also required the execution of the supplemental agreement included in Exhibit B attached to the plaintiff's complaint. As shown in paragraph 7 below, the facilities for which the loan in question was made will not be placed into operation before 1968 at the earliest. Based on load forecasts made before the loan was approved, AEC will have power and energy available for the total electric requirements of its members for a period of no more than 2 years thereafter. Based on the same forecasts, AEC's available power and energy in 1974 will represent no more than 83% of its members' electric requirements in that year, and such percentage will significantly decline each year thereafter. Under their contracts with AEC, the Members will be free to purchase from plaintiff and others their electric requirements in excess of the power and energy available from AEC.

"AEC is owned and controlled by its members and is merely the means by which they generate and transmit electric power for themselves rather than purchasing power and transmission service from another source. Instead of having one organization performing the generating, transmitting and distributing function, AEC engages in the first two operations on behalf of its members and the latter perform the distributing operation. Because of this separation of the operations required to serve consumers the 35-year, all requirements contracts between AEC and the Members were necessary to meet the requirements of

section 4 of the RE Act (7 U.S.C. 904)."

■ Thus in requiring AEC to obtain 35-year all-requirement contracts with its electric distribution cooperatives, the Administrator was doing nothing unusual, but was simply following customary and long-established REA practice, clearly not beyond the "outer perimeter" of his statutory authority[6] to determine the security for the loan. Anything less might well mean the acceptance of inadequate security. Under these circumstances, to require or permit the "outer perimeter" boundaries to be determined by another fact-finding body would defeat the reasons for the recognition of the absolute privilege. What was said by Mr. Justice Harlan in Barr v. Matteo, 1958, 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 is illuminating:

"It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." [7]

■■ Finally, a unique question presented by the Power Company must be answered. This is the first of the attacks by private companies on federal loans to competitors in which there has been a *separate* attack on the borrower and those alleged to be in conspiracy with it for claimed violation of the antitrust laws. It is argued that there is nothing in the Act or in its legislative history which authorizes the Administration to grant immunity to the borrower, AEC,[8] and that at the very least

6. 7 U.S.C.A. § 904.

7. See also Mr. Justice Harlan's long quotation from Judge Learned Hand's opinion in Gregoire v. Biddle, 2 Cir. 1949, 177 F.2d 579, 581, appearing at 360 U.S. 571–572, 79 S.Ct. 1339.

8. Or, we might add, to its member distributing cooperatives, though they have not been joined as parties defendant.

the plaintiff has a right to pursue its antitrust suit against AEC. That position, we think is based upon too narrow a conception of the program authorized by Congress. The making of loans by the Administrator necessarily includes the existence and ability of borrowers to whom such loans can be made. If the security which the Administrator requires can be undercut and the borrower mulcted in treble damages for complying with the condition imposed by the Administrator for making the loan, then the functioning of the Act will be crippled, if not defeated. To avoid frustrating the intent of Congress, it must follow that in cases where the Administrator is immune from suit under the antitrust laws, the borrower is likewise immune.[9]

The Supreme Court has repeatedly held that,

"* * * where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out.[15]

"15. United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315."

Eastern R. Conf. v. Noerr Motors, 1961, 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464.

■ The Power Company would treat REA simply as a rival public utility. We agree with the recent decision of the Federal Power Commission in Dairyland Power Cooperative, 37 F.P.C. 12, 35 L.W. 2385, that rural electric cooperatives are something more than public utilities; they are instrumentalities of the United States. "They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to

rural America." See also, Salt River Project Agricultural & Power District v. FPC, D.C.Cir. 1968, 391 F.2d 470.

The judgment is therefore

Affirmed.

GODBOLD, Circuit Judge, dissenting:

I must disagree with my associates.

This case presents in bold and clear form issues not heretofore judicially determined of the interplay between, on the one hand, the antitrust laws and the national policy which they represent and, on the other hand, the Rural Electrification Act[1] and national policies of aid to rural citizens without electric service. In addition there are vital factual issues which have been · neither determined nor reached, since the decision below was a dismissal for lack of standing to sue.

Three issues must be discussed. Discussion of each overlaps the others, and the relationship between them has been hazy at times in the previous case history:

(1) Standing to sue under the antitrust laws of the United States. In my opinion the Power Company has standing.

(2) Implied governmental immunity from the antitrust laws of the REA Administrator, of private citizens who deal with him, and of private citizens who deal between themselves as incident to or in consequence of dealings with the Administrator. In my view the Administrator has no such implied immunity as a governmental officer whether acting within or without the "outer periphery of his authority." If he possesses such implied immunity he cannot pass it on to private citizens to immunize them in their dealings with him

9. In so holding, we fully appreciate that immunity from the antitrust laws is not to be lightly implied. People of State of California v. Federal Power Commission, 1962, 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54; United States v. Philadelphia National Bank, 1963, 374 U.S. 321, 350, 83 S.Ct. 1715, 10 L.Ed.2d 915,

Carnation Company v. Pacific Wsetbound Conference, 1966, 383 U.S. 213, 218, 86 S.Ct. 781, 15 L.Ed.2d 709; United States v. First City National Bank, 1967, 386 U.S. 361, 368, 87 S.Ct. 1088, 18 L.Ed. 2d 151.

1. 7 U.S.C.A. § 901 et seq.

or to private citizens to immunize them in their dealings with each other.

(3) If the Administrator does enjoy an implied immunity the existence of which depends upon whether he was acting within the outer limits of his authority, there is a material issue of fact, not yet adjudicated, as to whether he was within such limits.

## I. The 35-year exclusive dealing contracts

The provisions of the contracts which the Administrator, as a condition of approval of the loan to AEC, required be executed by AEC and the distributor cooperatives, are central to the case. The majority describe the contracts, without amplification, as "certain 35-year all-requirement-electric contracts between AEC and fourteen electric distribution cooperatives." [2]

The contracts require the distributing cooperative (Distributor) to purchase all of its electric power needs from AEC (Supplier):

Supplier shall sell and deliver to Distributor and Distributor shall purchase and receive from Supplier all electric power and energy which Distributor shall require to the extent that Supplier shall have such power and energy available, provided, however, that Distributor shall have the right to continue to purchase electric power and energy from a source other than Supplier for all or a separable part of its system until Supplier shall be in position to supply Distributor's requirements for its system or such part thereof.

The contracts require the distributing cooperative, at such time as it may legally do so, to terminate its contracts with other power suppliers upon request of AEC made with the approval, or at the direction, of the Administrator. If the Distributor fails to terminate an existent contract either the Supplier or the Administrator may bring suit to enforce the termination provisions.

Distributor shall terminate, if the Supplier with the approval of the Administrator of the Rural Electrification Administration shall so request, any existing contract or contracts with a source other than Supplier at such time as it may legally do so, provided Supplier shall have sufficient electric power and energy available for Distributor.

\* \* \* \* \* \*

The Supplier, the Distributor and the Administrator agree that if the Distributor, upon being requested to do so by the Supplier with the approval or at the direction of the Administrator, shall fail to terminate any contract with a power supplier other than the Supplier, as provided by Section 1 of the Power Contract, the Supplier or the Administrator, if he shall so select, shall have the right to enforce the obligations of the Distributor under the provisions of said Section 1 of the Contract by instituting all necessary actions at law or suits in equity, including, without limitation, suits for specific performance. [3]

The Distributor purchases its power requirement under a rate schedule, which must be reviewed at least annually by it and AEC, and revisions may be agreed upon but are ineffective unless approved by the Administrator.

Contracts are required by the Administrator to be obtained from 13 distribution cooperatives located in Alabama, which the Power Company alleges endeavor to serve approximately 50% of the geographical area of the state, and three located in Florida. The Power

---

2. The distribution cooperatives are not parties to the suit. The Administrator claims he is not a party to the contracts. But see footnote 3, infra.

3. This paragraph is part of a "Supplemental Agreement," to which the Administrator is to be a signatory, to the 35-year contracts. It creates a question of fact and law of whether the Administrator himself becomes a party to the transactions between AEC and the distributors.

Company alleges the 35-year contracts will foreclose it from supplying nine of these cooperatives, six of whom presently receive all their power, and three that receive part of their power, from the Power Company, and as a consequence it will be foreclosed from serving at least one-third of the rural areas of Alabama. The extent of the private utility's loss of market is a disputed issue of fact, but even under the assertions of the appellees the share of the relevant market involved is, in my opinion, as a matter of law substantial.[4]

Totally without relevance is the contention of AEC that REA has made it previous loans and in connection with each has required similar 35-year contracts, but the Power Company has not before claimed them to be violations of the antitrust laws. There is no right by prescription to violate the antitrust laws. This theory that governmental action can bootstrap itself to a state of validity is expressly adopted by the majority, who conclude that in making the contracts the Administrator was not beyond the outer perimeter of his authority because he was "doing nothing unusual, but was simply following customary and long-established REA practice."

Neither the district court nor the majority in this court reach the issue of whether the contracts are proscribed by the antitrust laws. They simply decline to scrutinize them. The complaint—and at this stage we take its allegations as true—sets out a classic case of an exclusive supply contract which violates Section 3 of the Clayton Act because it forecloses in the relevant market a substantial share of the line of commerce affected. Pennsylvania Water & Power Co. v. Consolidated Gas, Elec. Light & Power Co., 184 F.2d 552 (4th Cir.), cert. denied, 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655 (1950); Consolidated Gas, Elec. Light & Power Co. v. Pennsylvania Water & Power Co., 194 F.2d 89 (4th Cir.), cert. denied, 343 U.S. 963, 72 S.Ct. 1056, 96 L.Ed. 1360 (1952). See also Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). While I view the violation as otherwise unquestionable, if there be any question the 35-year duration lays it to rest. It is an exclusive dealing arrangement that can foreclose the Power Company for the rest of the twentieth century. United States v. American Can Co., 87 F.Supp. 18 (N.D. Cal.1949).[5] Nor do I have any doubt

---

4. AEC states the loss will be of two all-requirements customers and three partial-requirements customers. In its brief AEC concedes the Power Company will lose, at least temporarily, approximately 16% of its total wholesale sales to cooperatives and municipal systems.

Several arguments of appellees may have relevance to a factual determination of impact on the relevant market, if that not be established as a matter of law, or of the extent of restraints on commerce, but have no relevance at this juncture—i.e., that AEC serves a smaller area and has smaller capital investment and operating revenue than Alabama Power; that based on AEC projections it will not generate enough power to serve all needs of the distributor cooperatives, and the private companies will have a chance to meet the need for the excess.

Certainly it cuts no figure at this stage, and maybe never, that REA argues the termination provisions of the contracts will not be exercised until expiration of existing wholesale contracts between distributors and Alabama Power, and if existing contracts are breached the power company will have an adequate remedy in damages.

5. See also United States v. Pullman Co., 50 F.Supp. 123, 129 (E.D.Pa.1943):

"As a competition killer the long term contract is an effective weapon. One could hardly have a more favored service contract than an agreement for exclusive dealing * * * and a quarter century of time to elapse before one need to be concerned with new terms. Even a patentee is not so secure against the passage of time."

that the contracts, and the effects alleged, constitute restraints violating the Sherman Act. *Consolidated Gas,* supra.[6]

Standing alone the contracts violate the antitrust laws. As part of a wider course of dealings they violate the antitrust laws and so characterize that broader spectrum as to make it a violation. The violation by the contracts is so clear that I do not pursue the allegations that the Administrator coerced the distribution cooperatives into signing them, a factual issue.

## II. Immunity

The majority conclude the Administrator enjoys a governmental immunity from the Sherman and Clayton Acts for acts done within the outer periphery of his authority. Examination of this premise is inextricably entwined with consideration of the two implications drawn therefrom, that the Administrator's immunity extends to private citizens (the AEC) who deal with him and to private citizens who deal between themselves (the AEC and the distribution cooperatives) as an incident to or in consequence of their dealings with the Administrator.

None of these immunities can be found in the REA Act.

The majority opinion tips its hat to the principle that "[i]mmunity from the antitrust laws is not lightly implied." People of State of California v. Federal Power Comm'n, 369 U.S. 482, 485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54, 57 (1962). In fact, "[t]his canon of construction * * * reflects the felt indispensable role of antitrust policy in the maintenance of a free economy." United States v. Philadelphia Nat'l Bank, 374 U.S.

321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915, 936 (1963).

Congress can, and in numerous instances by express legislation has, subordinated the national policies reflected in the antitrust laws so as to authorize government officials to perform acts or pursue policies without regard to the antitrust laws. The exemptions or immunities thus conferred are in some instances to conduct between the official and the citizen, in others to dealings between private citizens which the official is authorized to review and if approved the citizen has immunity. The courts carefully have limited these expressly conferred immunities to the scope defined in each instance by Congress so as to avoid pro tanto repeal of the antitrust laws.

Under the Agricultural Marketing Agreement Act the Secretary of Agriculture may become a party to marketing agreements with private citizens for the handling of agricultural commodities which are exempt from the antitrust laws. 7 U.S.C.A. § 608b. In United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939), the Supreme Court declined to broaden this specific exemption into a general exemption from § 1 of the Sherman Act of the marketing of agricultural commodities so as to immunize marketing agreements between private parties.[7] "If Congress had desired to grant any further immunity, Congress doubtless would have said so." 308 U.S. at 201, 60 S.Ct. at 189, 84 L.Ed. at 192. In the case before us the majority find an implied governmental exemption and the blanket thereof is then stretched to immunize exclusive dealing contracts be-

6. The contract in *Consolidated* included price fixing, a per se violation of the Sherman Act. Also it foreclosed competitors from a substantial market and divided territory between competitors. 184 F.2d at 558, 559.

7. In like manner the Secretary of Agriculture may make marketing agreements with manufacturers and handlers of anti-

hog-cholera serum and hog-cholera virus, 7 U.S.C.A. § 851 et seq., and the agreements are specifically exempted from antitrust laws, 7 U.S.C.A. § 852. The exemption extends no further than to the agreement itself. American Co-op. Serum Ass'n v. Anchor Serum Co., 153 F. 2d 907 (7th Cir.), cert. denied, 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625 (1946).

tween private parties, AEC and the distribution cooperatives.

"[T]he typical method adopted by Congress when it has lifted the ban of the Sherman Act is the scrutiny and approval of designated public representatives," (giving examples of the code machinery and presidential approval under the National Industrial Recovery Act, the ICC in transportation, the SEC over associations of brokers and dealers, the Bituminous Coal Commission over price fixing in the coal industry). United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 228 n. 60, 60 S.Ct. 811, 846, 84 L.Ed. 1129, 1170 n. 60 (1940). The REA Act does not lift the ban. Nor does it confer upon the Administrator authority to create or approve, or to state applicable standards to govern the creation or approval, of situations or relations in derogation of the antitrust laws.

Compare the transportation industry. The original authority of the Interstate Commerce Commission [8] exemplified an implicit public policy that competition in the transportation field was desirable, a policy subsequently expressed for a broader field in the Sherman Act of 1890.[9] Subsequently, and repeatedly, Congress has amended the Interstate Commerce Act to grant authority to the ICC, in the context of a pervasive regulatory scheme, to approve and permit consolidations, mergers, controls, combinations, and agreements to fix rates, all outside the usual operation of the antitrust laws.[10] The history reveals carefully-held Congressional reins over the interplay of antitrust policy and governmental action in derogation thereof. The Congressional action to create exemptions has not made the antitrust laws wholly inapplicable to the transportation industry; Congress has not authorized the ICC to ignore antitrust policies, for the Commission is under a duty, as an administrative matter, to consider effect on competitors and on the general competi-

tive situation in the light of national transportation policy. McLean Trucking Co. v. United States, 321 U.S. 67, 84 nn. 20 & 21, 64 S.Ct. 370, 379 nn. 20 & 21, 88 L.Ed. 544, 555 nn. 20 & 21 (1944).

With respect to many regulated industries the courts have rejected the theory that governmental grant—federal or state—of monopolistic privileges accompanied by regulation, sometimes all-pervasive, by government bodies carries an implied exemption from the antitrust laws or deprives the courts of jurisdiction to enforce them. See State of Georgia v. Pennsylvania R.R., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), sustaining the right of an injured party, the State of Georgia, to enjoin a conspiracy of railroads to fix rates in violation of the antitrust laws, although the rates had been approved by the ICC:

But it is elementary that repeals by implication are not favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only pro tanto to the extent of the repugnancy.

\* \* \* \* \* \*

It is sufficient here to note that we find no warrant in the Interstate Commerce Act and the Sherman Act for saying that the authority to fix joint through rates clothes with legality a conspiracy to discriminate against a State or a region, to use coercion in the fixing of rates, or to put in the hands of a combination of carriers a veto power over rates proposed by a single carrier. The type of regulation which Congress chose did not eliminate the emphasis on competition and individual freedom of action in rate making.

324 U.S. at 456–57, 458–59, 65 S.Ct. at 726, 89 L.Ed. at 1062, 1063. See also, as to railroads, United States v. Terminal R.R. Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); the shipping industry,

---

8. Interstate Commerce Act of 1887, 49 U.S.C.A. § 1 et seq.

9. 15 U.S.C.A. §§ 1–7.

10. See the discussion of the history in United States v. Marshall Transport Co., 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110 (1944).

Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); banking, United States v. Philadelphia Nat'l Bank, supra; insurance, United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); telephone, United States Tel. Co. v. Central Union Tel. Co., 202 F. 66 (6th Cir. 1913); gas and electric energy, In re American Fuel & Power Co., 122 F.2d 223 (6th Cir. 1941); Pennsylvania Water & Power Co. v. Consolidated Gas, Elec. Light & Power Co., supra; radio and television, United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1958); natural gas, People of State of California v. Federal Power Com., 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); export trade associations, United States Alkali Exports Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945).

The Capper-Volstead Act [11] authorized agricultural producers to unite in preparing for market, and marketing, their products, and to make contracts necessary for that collaboration. The antitrust exemption thereby granted is much broader than the general provision of § 6 of the Clayton Act which excepts agricultural and horticultural cooperatives from the Sherman Act. But *Borden* held that the Capper-Volstead Act does not cover the entire field of the Sherman Act and does not authorize a combination or conspiracy with persons other than producers. See also, Maryland & Virginia Milk Producers Ass'n v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).

Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed. 2d 621 (Dec. 18, 1967), holds that the antitrust exemption granted by Congress to producer cooperatives under Capper-Volstead does not extend to give antitrust immunity to an association which has nonproducer interests in its participating membership, even though the participation of the nonproducers is relatively small.

The Fishermen's Collective Marketing Act [12] authorizes fishermen to market collectively, and the Secretary of the Interior has power to issue cease and desist orders if such organizations restrain trade to the extent of unduly enhancing prices. Neither Congressional authorization of the cooperative marketing association nor the power of the Secretary exempts fishermen and their association or union from the antitrust laws. Hinton v. Columbia River Packers Ass'n, 131 F.2d 88 (9th Cir. 1942).

There are various specific exemptions from antitrust laws in the labor field. Section 20 of the Clayton Act [13] withdrew from the general prohibitions of the Sherman Act specifically enumerated practices of labor unions by prohibiting injunctions. Norris-LaGuardia [14] further narrowed the jurisdiction of federal equity power in labor disputes. Thereafter in determining if trade union conduct is a violation of Sherman one must read and harmonize Sherman, § 20 of Clayton, and Norris-LaGuardia. United States v. Hutcheson, 312 U.S. 219, 61 S. Ct. 463, 85 L.Ed. 788 (1941); Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). But Congress in granting immunity to labor organizations did not give immunity to combinations of labor with non-labor groups. Allen Bradley Co. v. Local No. 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). The Supreme Court, in *Allen Bradley*, found nothing in the Congressional history to indicate that it was ever suggested, considered or legislatively determined that unions, while free to engage themselves in conduct which restrains trade, were to be granted immunity for aiding and abetting manufacturers and traders in violating the

11. 7 U.S.C.A. §§ 291–292.

12. 15 U.S.C.A. §§ 521–522.

13. 29 U.S.C.A. § 52.

14. 29 U.S.C.A. § 101 et seq.

Sherman Act, the availability of such an exemption being solely for Congress.[15]

The distribution cooperatives have no special status under the antitrust laws by reason of their being cooperatives. "It is significant that when Congress has desired to permit cooperatives to interfere with the competitive system of business, it has done so expressly by legislation." Associated Press v. United States, 326 U.S. 1, 14, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013 (1945).

The judicially-created immunities of this case are rested on § 4 of the REA Act, 7 U.S.C.A. § 904. The Administrator squarely puts his requirement of the 35-year contracts on his power and obligation under § 4 to obtain reasonable security for the loan, that "loans shall be on such terms and conditions relating to the expenditure of the moneys loaned and the security therefor as the Administrator shall determine." It boggles the imagination to suggest that the myriad of government agencies having the power

to lend (each based on Congressional determination that the particular lending power authorized is in the national interest) are, by reason of routine administrative control over sufficiency of collateral, vested with implied power to carve out of the national economy exempt enclaves in which borrowers may deal free of the antitrust laws.

The REA Act, and its Congressional history, reveal no purpose of granting any power to the Administrator to operate free of national antitrust policy.[16]

It is beyond question that the purpose of the central station service provision of § 904 was to give private utilities some measure of protection from competition created as a result of REA loans.[17] Protection from lawful competition of REA-financed borrowers has been held not a constitutional entitlement and a matter for relief solely in Congress. But it flies in the teeth of the Congressional intent expressed in § 904—protection of private utilities from a described area of com-

---

**15.** "It must be remembered that the exemptions granted the unions were special exceptions to a general legislative plan. The primary objective of all the Antitrust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves. Seldom, if ever, has it been claimed before, that by permitting labor unions to carry on their own activities, Congress intended completely to abdicate its constitutional power to regulate interstate commerce and to empower interested business groups to shift our society from a competitive to a monopolistic economy.

\* \* \* \* \*

"There is, however, one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices. It intended to

outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the Act." 325 U.S. at 809–810, 811, 65 S.Ct. at 1540, 89 L.Ed. at 1948–1949.

**16.** If he had any implied power there would be an additional question of the scope of it—i.e., can he exclude a private utility as a competitor; can he require a private citizen to make an exclusive dealing contract as a condition of a loan?

**17.** See Hearings on S. 3483 Before the House Comm. on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 30, 56–57, 72–73 (1936). See also the floor debates in both the House, 80 Cong.Rec. 5295, 5307; 5308 (1936), and the Senate, 80 Cong.Rec. 3305–06 (1936). Mr. Rayburn summarized the purpose of the bill during the House debate:

"May I say to the gentleman that we are not, in this bill, intending to go out and compete with anybody. By this bill we hope to bring electrification to people who do not now have it. This bill was not written on the theory that we were going to punish somebody or parallel their lines or enter into competition with them. \* \* \*"

80 Cong.Rec. 5283 (1936).

petition—to distill the same § 904 into an authorization to the Administrator to require, with impunity and immunity, action that freezes out the private utility as a competitor. By some unrevealed process of alchemy the partial shield given the private utility against the REA borrower by § 904 is converted into a sword in the borrower's hands.

The authorities relied on by the majority for a general principle of governmental exemption from the antitrust laws do not support so broad a pronouncement.

Parker v. Brown, 317 U.S. 341, 63 S. Ct. 307, 87 L.Ed. 315 (1943), was concerned with action by the State of California in setting up a raisin marketing program. The state command vel non was held the act of the sovereign, not forbidden by the Sherman Act.[18] E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority,[19] and Miley v. John Hancock Mut. Life Ins. Co.[20] are concerned with sovereign immunity of the state and follow Parker v. Brown.

Eastern R.R. Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), held that a violation of the Sherman Act cannot be predicated upon attempts to influence the passage or enforcement of laws. The Court distinguished between an agreement jointly to seek legislation or law enforcement and agreements traditionally condemned by the Sherman Act, and it warned against treating defendants' conduct as though it were a common-law trade restraint. Presumably the majority refer to the first sentence of the following part of the opinion:

> Accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution.

The limiting language of the second sentence makes quite plain that the governmental action referred to is of the particular kind before the Court. Primarily the Court was concerned with protecting the legislative process. It speaks (365 U.S. at 136–137, 81 S.Ct. at 529, 5 L.Ed.2d at 470–471) of associations seeking to persuade the legislative or executive to take particular action with regard to passage or enforcement of laws, of the significance in a representative democracy of the people making their wishes known to their representatives, and the constitutional issue of the right to petition.

United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), was concerned with joint efforts of private citizens to influence public officials, approaches to the Secretary of Labor by union and large companies to establish a minimum wage under the Walsh-Healey Act[21] which would make it impossible for

---

18. The court pointed out, "we have no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade," (317 U.S. 351–352, 63 S.Ct. at 314, 87 L.Ed. at 326) and, "the state in adopting and enforcing the pro-rate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." (317 U.S. at 352, 63 S.Ct. at 314, 87 L.Ed. at 327).

19. 362 F.2d 52 (1st Cir. 1966). There is an over-broad dictum in *Wiggins* of a general governmental immunity. There was no conspiracy in the case, only a "simple agreement or arrangement."

20. 148 F.Supp. 299 (D.Mass.), aff'd, 242 F.2d 758 (1st Cir. 1957).

21. 41 U.S.C.A. § 35 et seq.

smaller companies to compete. The plaintiff was held, under *Noerr*, not entitled to damages arising from the Secretary's Walsh-Healey determinations, not because of any governmental immunity but because his action was "the act of a public official who is not claimed to be a co-conspirator." (381 U.S. at 671, 85 S.Ct. at 1594, 14 L.Ed.2d at 637). The REA Administrator is claimed to be a conspirator.[22]

Stroud v. Benson, 155 F.Supp. 482 (E.D.N.C.1957), refers to sovereign immunity to the antitrust laws, quoting the Parker v. Brown language concerning state action (which was not involved). There was no allegation of conspiracy, only of the validity of an order of the Secretary of Agriculture, and there was no restraint of trade.

The cases do not support a proposition of general governmental immunity. If there is such a principle Congress has been proceeding for a long time under a misapprehension in providing for government officers, and those with whom they deal, exemptions which are specific in nature and varying in scope.

### III. The material issues of fact

The majority acknowledge a possible application of the antitrust laws if the Administrator went beyond the outer perimeter of the authority granted him by statute.

The motions to dismiss were submitted to the district court, along with the motions for summary judgment and motion for preliminary injunction, on the pleadings, affidavits, exhibits, and briefs and argument. The district court and the majority in this court have drawn freely on the affidavits and exhibits to support their conclusions. The Complaint and answer alone, but in sharpened form when aided by the other pleadings and the supporting affidavits and exhibits, squarely raise a factual issue of whether the Administrator is acting within or without his outer limits. That question of fact was not determined by the district court.

In this court the majority say that to require or permit a fact-finding body to determine the outer perimeter boundaries, or 'the range of permissible choices contemplated by the statute,' would defeat the reasons for recognition of the privilege of government officials against suit, relying upon Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1958). I do not understand this statement. *Barr* itself, as have numerous other cases, determined outer perimeter boundaries:

> The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint * * *

360 U.S. at 575, 79 S.Ct. at 1341. See also Norton v. McShane, 332 F.2d 855,

---

22. The first holding of *Pennington* was that a concerted effort to influence public officials is regardless of intent not within the Sherman Act. There is no such question in the present case, but the holding is a recognition that *Noerr* is about a particular kind of governmental action.

Additional judicial recognition that *Noerr* does not establish a carte blanche governmental immunity is Harman v. Valley Nat'l Bank, 339 F.2d 564 (9th Cir. 1964):

"Nonetheless, Noerr does not necessarily bar relief under the present complaint. The complaint can be read as alleging that appellees' joint effort to influence the Attorney General was but one element in a larger, long-continued scheme to restrain and monopolize 'commercial banking in particular and the financial industry in general within the State of Arizona.' Moreover, the complaint alleges that the acts of the Attorney General were those of a participating conspirator. In Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943), the Court specifically reserved the question of the applicability of the Sherman Act to the case of 'a state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade,' and Noerr does not hold that the Act would be inapplicable in such a situation."

339 F.2d at 566.

862 (5th Cir. 1964). To couple a privilege for acts done within the perimeter with immunity from judicial investigation of where the perimeter lies, or where the "permissible choices" end, would expand the privilege into immunity for any act done.

The privilege originated with judicial officers, but has been extended to some executive officers. It has its greatest vitality in the field of defamation, but by implication has been extended to civil torts generally. Norton v. McShane, supra footnote 2, 332 F.2d at 858. The privilege seems to me to have the least force, if any force at all, in the case where the executive officer's authority— his "permissible choices"—and the wrong against which privilege is asserted both are created by Congressional enactment. The privilege of the officer and the Congressional authority to grant or withhold immunity from the statutory wrong then pull in opposite directions. To give effect to privilege in that situation is to grant by indirection an immunity to a statutory offense which Congress, in creating the offense, saw fit to withhold. The government officer may not thus insulate himself from Congressional intent.

While disclaiming the propriety of any fact finder's doing so the majority make a finding that the Administrator did not go beyond his outer perimeter or exceed his "permissible choices," basing it on customary REA practice and his affidavit reciting his "policy reasons" for approving the loan. That finding, not made by the district court, is inappropriately made by an appellant court. It is not sustained by the record, which shows that whether the Administrator was within the outer limits of his authority is a serious, disputed and material issue of fact.

The complaint alleges repeatedly that the proposed loan, and the proposed use of the loan funds, violate the central station service requirement of § 904.[23] The position of the defendants on these allegations is far from clear. The loan commitment letter of REA to AEC contains several conditions but none limiting use of the funds to the statutory purpose. As part of a petition to secure the state consent required by the third proviso of § 904 there were filed with the Department of Finance of the State of Alabama resolutions of the Board of Trustees of AEC. They call for construction and operation of "generating facilities and additional electric transmission, distribution and service lines, together with all necessary appurtenances, in rural areas in [describing the areas], and along such routes as shall be approved by the Administrator of the Rural Electrification Administration for the purpose of furnishing electric energy to consumers not receiving central station electric service." [24] Whether routes approved by the Administrator may be in non-rural areas, and whether "consumers not receiving central electric station service" may be in non-rural areas, depend on construction of the resolutions.

A feasibility study was made for AEC by a consulting engineering firm, which on January 8, 1962 reported to AEC.[25] It makes no mention of the statutory

23. "The Administrator is authorized and empowered * * * to make loans for rural electrification * * * for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central station service."

24. This petition also says that AEC furnishes electricity to named electric cooperatives and industrial plants and that it indirectly serves electric needs of over 25,000 farm families, 9,900 residential consumers, and in excess of 7,600 industrial and other users.

25. The report says:
"Expansion of the power supply and transmission facilities of your Cooperative is required to meet the following objectives: (a) To serve increasing electric demands of member systems. (b) To provide improved service to additional members. (c) To reduce power costs. (d) To transmit power from Southeastern Power Administration (SEPA) to member cooperatives as preference customers. As a result of engineering stud-

standard of § 904. It does not state who the "additional members" are and where located.

The Power Company asserted before the Department of Finance of Alabama its contention that § 904 was being violated. The Department made no finding thereon, saying tersely that AEC's proposal "serves some public need and is in the public interest." On limited review of the Department's action by certiorari the state circuit court quashed the order of the Finance Department as not supported by sufficient competent evidence. If found the § 904 purpose was not complied with.[26] On appeal the Alabama Supreme Court reversed and rendered because the circuit court had applied the wrong standard of review. Alabama Elec. Co-op., Inc. v. Alabama Power Co., 278 Ala. 123, 176 So.2d 483 (1964). It declined to pass on the central station service issue, pointing out, inter alia, that in the Kansas City case there had been a decision on the merits in the district court that the contract in question did not violate the central station provisions.

When the case now before us reached the district court defendants filed the affidavit of Administrator Clapp. Pertinent extracts referring to the purposes of the loan are set out in the margin.[27] This is the same affidavit from which the

ies which have been made, a plan of expansion is developed which will achieve the above objectives."

26. "It is also undisputed that this multi-million dollar expenditure of Federal funds by AEC is not designed to deliver central station electric service to persons in rural areas who are not already receiving central station service or have it available on application." Alabama Power Co. v. Alabama Elec. Co-op., Inc., No. 3519 (Ala.Cir.Ct., July 9, 1963).

27. "Such facilities [to be constructed with the proceeds] were intended to be used to supply electric power needs of [describing cooperatives] * * * to enable them to furnish electric energy to their member-consumers who, being persons in rural areas not receiving central station service, were supplied with electric energy for the first time through electric facilities financed by REA, pursuant to 7 U.S.C. 901 et seq. * * *"

"In addition to the use of the facilities to supply the cooperatives described in the preceding paragraph concerning which plaintiff complains, such facilities were also intended to be used to serve the electric power needs of certain other Alabama and Florida electric distribution cooperatives, and of AEC, to enable them similarly to (1) furnish electric energy to their member-consumers who, being persons in rural areas not receiving central station service, were supplied with electric energy for the first time through electric facilities financed by REA pursuant to the RE Act; or (2) enable them to continue to furnish electric service to those of their consumers who are supplied electric energy through electric facilities acquired by AEC or a member thereof with the proceeds of loans made by REA, pursuant to the RE Act, as a mecessary [sic] and incidental means of extending service to unserved persons in rural areas, and as a means of providing generating and transmission facilities to supply the needs of the consumers served by AEC and it members. All of the electric distribution cooperatives referred to above are members of AEC and are hereinafter collectively called 'Members'."

* * * * *

Elsewhere in his affidavit the Administrator states he approved the loan because it would effectuate the policies and purposes of the REA Act in these respects:

"(a) The loan will result in power cost savings to AEC and the Members, thus assisting them in rendering electric service to their consumers at the lowest cost consistent with sound economy and prudent management of their enterprises;

"(b) The loan will help protect the Members in their ability to make the most effective use of their REA-financed systems through continued service to all their existing member-consumers and extension of service on an area coverage basis to new retail electric loads which will arise in the service areas which the Members have developed through construction and acquisition of said systems and the extension of service therefrom;

"(c) By helping the Members make the most effective use of their REA-financed systems, the loan will enable them to further the achievement of the purposes and policies of the RE Act in Alabama by providing service to their approximately

statement of "policy reasons" quoted by the majority is taken.

Possibly the affidavit is an effort to assert facts within the construction of "central station service" reached by the district court in the *Kansas City* case, Kansas City Power & Light Co. v. Mc-Kay, 115 F.Supp. 402 (D.Ct.D.C.1953), that loan agreements were within the § 904 requirement when providing for a successive loan (to a cooperative originally financed by REA) to meet increasing power requirements of members presently being served and to supply the demand for service from new consumers in surrounding areas denied such service except for the assistance of REA. The difficulty is that some of the Administrator's statements of fact are controverted by the complaint and by affidavits filed in the district court by the Power Company, setting out that consumers of some of the member cooperatives said by Clapp to have been supplied with electric energy for the first time through electric facilities financed by REA in fact had been in the past, and are at present, supplied with central station service by the Power Company. A Power Company affidavit says: "As a matter of fact, the major portion of the proposed expanded project of Alabama Electric Cooperative is to furnish electric service to persons who have been, were at the time the loan was approved and are now being supplied by central-station electric power generated in central stations of Alabama Power Company and Gulf Power Company."

The district court in *Kansas City* made its findings after a three-week trial, expert testimony and numerous exhibits. In the case before us the district court made no findings.[28] From this record it is impossible to determine with any degree of assurance that the proposed loans are within the Congressional authority granted by § 904. It is impossible to tell whether the Administrator has correctly acted in accord with the statutory purpose, or has gone beyond his outer periphery, or is in an intermediate zone in which he has made an administrative decision which though erroneous is not beyond his outer limits.[29]

The factual issues drawn are not answered by case law that when the Administrator is acting within the periphery of his authority the national policy of aid to rural electrification prevents judicial review of his action.

Disposition of the case without hearing and findings of fact makes impossible another pertinent inquiry. The character and quality of acts done by the Administrator and their impact as restraints on trade and competition are relevant on several issues—relating to immunity and standing—whether there was Congressional intent to exempt acts of this general character and of this specific nature, and the weight to be given to the acts done in the balancing of rural electrification and antitrust policies. Valid determinations cannot be reached in this case without factual data that definitively presents just what it is that the Administrator and the private citizens have required, agreed upon and done, and the impact thereof on the relevant market. The issues cannot be re-

81,000 member-consumers, and others in their service areas, who may be without central station service, under conditions which will make available the full benefits of electric service for the member-consumers and the service areas of the Members."

28. The state circuit court, the only body yet to make a finding on the issue of central station service (other than the one-sentence finding by this court) was reversed but on other grounds. See note 26 supra and accompanying text.

29. The Power Company contends that one of the reasons for requiring the exclusive dealing contracts arises from the fact that the central station service provisions are being violated, i. e., that the contracts are the means adopted by the Administrator to eliminate the competition which will ensue between the distributing cooperatives and the existent suppliers. Like other factual issues, this cannot be resolved on motion to dismiss.

solved in a vacuum nor on the basis that the facts are undisputed, for they are not.

## IV. Standing

On its antitrust theory the Power Company claims standing under Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 and 26, and asserts substantive violations of Section 3 of the Clayton Act, 15 U.S.C.A. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2.

In concluding that there is no standing under the antitrust laws the majority, as did the district court, treat this case as one more in the line of *Ickes*,[30] *TVA*,[31] *Kansas City* [32] and *Central Louisiana*.[33] Those cases do not reach the issue before us. They represent a succession of efforts by private utilities to establish standing by combining a charge that the government officer was making an unauthorized loan (or otherwise acting outside his authority) with a charge that the purpose or effect was to create competition for the plaintiff, this combination being then characterized as "unlawful competition" or "conspiracy." These efforts were rebuffed, because review of loans is for Congress and not the courts, and the private utilities have no legally protectible right to freedom from competition.

Those established principles have no application to a complaint by the private utility of actions which in themselves are monopolistic in nature and violate the antitrust laws. The actions here charged draw their characteristics of invalidity from their own nature and impact, not from efforts to create a synthesized illegality. The Power Company does not complain of the "mere competition" of *Central Louisiana* or the lawful competition of *TVA* and *Kansas City* but of unlawful competition, exclusive dealing contracts and coercion. There is no national policy to create monopoly, or unlawful competition, or engage in coercion, in the name of competition. "Competition" is not a magic word which when uttered dispenses with consideration of what as a matter of fact is being done and what as a matter of law and national policy are the consequences.

*Ickes* was a suit for general equitable relief not under the antitrust laws. The Supreme Court declined to enjoin agreements and grants for municipal electric systems "on the sole and detached ground that the administrator lacks constitutional and statutory authority to make them, and that the resulting moneys, which the municipalities have clear authority to take, will be used by the municipalities in lawful, albeit destructive, competition with petitioner." The Court referred to the finding of the district court that the contracts did not require the municipalities to eliminate competition or designate the source from which they must purchase power. The Court referred numerous times to the competition as lawful, noted that there was no conspiracy and made the oft-repeated dictum, "If conspiracy or fraud or malice or coercion were involved a different case would be presented." [34]

*TVA* also was not filed under the procedural provisions of the antitrust laws but was for general equitable relief, and on the theory public power competition was illegal because it injured property rights represented by the private fran-

**30.** Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938).

**31.** Tennessee Elec. Power Co. v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939).

**32.** Kansas City Power & Light Co. v. McKay, 225 F.2d 924 (D.C.Cir.1955), reversing 115 F.Supp. 402 (D.D.C.1953), cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955).

**33.** Rural Electrification Administration v. Central Louisiana Elec. Co., 354 F.2d 859 (5th Cir. 1966), reversing 236 F. Supp. 271 (W.D.La.1964), cert. denied, 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54 (1966).

**34.** In Duke Power Co. v. Greenwood County, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381 (1938), decided the same day, the proposed competition had been held by the district court to be lawful, and there was no finding of conspiracy.

chises. The Supreme Court pointed out that possession of the franchises did not render competition illegal and conferred no contractual or property right to be free of competition. There had been specific findings by the district court that the Tennessee Valley Authority had not conspired or coerced.[35] The Court made clear the distinction between unlawful conspiracy and lawful cooperation by government officials leading to lawful competition.[36]

*Kansas City* is inapplicable for two reasons. First, no cause of action was asserted under the antitrust laws (see 225 F.2d at 936). The suit was for declaratory judgment based on the Rural Electrification Act [37] and the Flood Control Act of 1944,[38] neither of which is a statutory provision designed to protect competition.[39] Second, the nature and quality of the acts charged were such that as a matter of law there was no "conspiracy." *Kansas City*, as had *Ickes*, teaches that the spectrum of dealings between private citizens and government officials is not made a "conspiracy" by the fact alone that the official exceeds his authority. In neither case was there action which carried within itself the seeds of restraint or monopoly.[40]

*Central Louisiana* was a suit for temporary injunction to prevent the REA from consummating a loan. It did not involve standing under Sections 4 and 16 of the Clayton Act. In the district court Judge Dawkins held plaintiff had made out a prima facie case of illegal competition and coercion and granted the temporary injunction. On appeal this court reversed, holding that there was not raised anything more than "mere economic competition made possible by governmental action." It reinforced this conclusion by the further statement that "their [appellees] only standing for this [that the loan was illegally made and would cause illegal consequences] is their natural opposition to having territory invaded which heretofore has been de facto their sole domain but in which they have no exclusive right." 354 F.2d at 865.

*Central Louisiana* dealt with invasion of the private utility's territory by a "mere competitor." We deal in this case with ouster of the private utility from a market by a borrower under a monopolistic contract. Whether exclusive dealing contracts standing alone violated the antitrust laws, and whether as a part of the overall dealings they violated the antitrust laws and thereby caused the overall dealings to be in violation, were matters not decided in *Central Louisiana*. There are references to 35-year requirement contracts (see 354 F.2d at 863) but no such contracts had been executed (al-

---

35. "The District Court finds that the Authority has not indulged in coercion, duress, fraud, or misrepresentation in procuring contracts with municipalities, cooperatives or other purchasers of power; has not acted with any malicious or malevolent motive; and has not conspired with municipalities or other purchasers of power. The record justifies these findings." 306 U.S. at 145, 59 S.Ct. at 373, 83 L.Ed. at 553.

36. "Cooperation by two federal officials, one acting under a statute whereby funds are provided for the erection of municipal plants, and the other under a statute authorizing the production of electricity and its sale to such plants, in competition with the appellants, does not spell conspiracy to injure their business. As the court below held, such cooperation does not involve unlawful concert, plan, or de-sign, or cooperation to commit an unlawful act or to commit acts otherwise lawful with the intent to violate a statute." 306 U.S. at 146–147, 59 S.Ct. at 374, 83 L.Ed. at 554.

37. 7 U.S.C.A. § 901 et seq.

38. 33 U.S.C.A. § 701–1 et seq.; 16 U.S. C.A. § 825s et seq.

39. See the discussion of Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), infra.

40. This is the point which Judge Washington in *Kansas City* seeks to make in his reference to *Ickes*. It is the same point made by Judge Coleman in *Central Louisiana*, that lawful competition plus excess of statutory authority do not constitute the kind of "conspiracy" the Court had in mind in *Ickes*. 354 F.2d at 866.

though it was recognized the Administrator would require them) and neither AEC nor the distributor cooperatives were parties to the suit.[41]

Rural Electrification Administration v. Northern States Power Co., 373 F.2d 686 (8th Cir. 1967), considers standing under the Administrative Procedure Act and under the REA Act itself. It does not reach the antitrust issue.

This brings us to the latest chapter. In Kentucky Utilities Co. v. TVA, 375 F.2d 403 (6th Cir. 1966), rev'd sub nom. on other grounds, Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787, (1968), the private power company sought an injunction restraining TVA, its distributor (an electric cooperative), and mayors of cities concerned, who were charged with a conspiracy by which the cooperative would take over the supply of electric power to the cities in violation of 16 U.S.C.A. § 831 n—4(a) forbidding TVA from making new contracts to supply power outside the area for which it or its distributors were the primary source of power on July 1, 1957. The district court found against the private power company on the merits but held it had standing to sue. 237 F.Supp. 502 (E.D.Tenn. 1964). The Court of Appeals affirmed on standing to sue, pointing out that the court did not ask a decree protecting it from all competition but from violation of the statute, which had been enacted to protect established utilities from intrusion by TVA into areas where such utilities already were established. Of significance on the matter of standing to sue under the antitrust

laws, the court distinguished *Ickes, TVA* and *Kansas City*:

> All of them involve efforts by private utilities to get court relief from the competition of publicly owned or supported power facilities which were creatures of the Federal Government's entry into the power business. The right to sue and the asserted ground for relief in each case were bottomed upon broad claims of unconstitutionality of the federal power program, illegality in the means whereby competitors of private utilities had or would obtain the funds to set up their operations and other charges of illegality in the establishment of the plaintiffs' competitors. Such plaintiffs were held to be without standing to sue. Their surface analogy is immediately dissipated by the fact that in none of them was the plaintiff's suit planted on a federal statute enacted specifically for the protection of the involved plaintiff. The plaintiff utilities did not have exclusive franchises, and the cases hold that where there is no constitutional or common law right to be free of competition and where the hurting competition is valid as competition, the courts will not restrain it because of some antecedent illegality in its creation or in its obtaining of funds.

The Supreme Court affirmed on standing to sue, distinguishing "lawful competition" cases (including *TVA*), in which "competitive injury provided no basis for standing . * * * simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury,"

---

41. About as close as the court came to considering the contracts is the statement (354 F.2d at 864):

"The appellees have been and are now doing business with cooperatives established and financed under the REA Act. The record shows no intention or attempt to abrogate *existing contracts* between the parties. Appellees do not have a Constitutionally guaranteed, un-restricted privilege to engage in business free of competition."

If this means that exclusive dealing contracts violate the anti-trust laws only if they abrogate existing contracts between one of the parties thereto and others, then it is wrong and the quicker corrected the better. The right of the private utility is that it not be foreclosed from the market, which may or may not involve breach of an existent contract.

from the contrasting cases in which "the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision." The power company had standing because it "is thus in the class which § 15d is designed to protect." *Kansas City* was characterized as holding that an injured competitor cannot sue to enforce statutory requirements not designed to protect competitors [in that case not the antitrust laws but the REA Act and the Flood Control Act of 1944].

It seems to me beyond rational question that the antitrust laws were designed to include competitors as among those protected. As much is conceded by REA in its latest brief:

> We stress, however, that, if Alabama Power Co. could not bring suit, it would be solely because of an absence of a legally cognizable injury to it and not because it was the Alabama Power Co. In short, contrary to appellant's implication, we have never suggested that the principles governing its standing to sue are any different than those applicable to other parties.

Specifically, § 16 of the Clayton Act provides for the right of the private party to sue for injunctive relief against threatened loss or damage by violation of the antitrust laws.

Insofar as the antitrust laws are concerned, this court need not pause on the inquiry—over which the parties do mighty battle in their briefs—of attack on the loan vs. attack on the requirement contracts as an incident of the loan. The Power Company has standing to attack the contracts standing alone, whether or not the Administrator is a formal party thereto, and to attack the broader range of activities of which the contracts are a part and in which the parties defendant are charged as participants.

I agree with my brothers that REA is an instrument chosen by Congress to bring abundant and low cost power to our rural citizens and is not just another utility. But that characterization does not answer whether it is to be given an implied immunity to deal free of antitrust law and national antitrust policy.